485 So.2d 909 (1986)
STATE of Louisiana
v.
Janice PAUTARD.
STATE of Louisiana
v.
Johnny DUNCAN.
Nos. 85-K-1323, 85-K-1575.
Supreme Court of Louisiana.
March 31, 1986.
Rehearing Denied May 9, 1986.
Robert J. Roux, Alton T. Moran, Office of Public Defender, Baton Rouge, for Pautard.
William J. Guste, Jr. Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Bryan Bush, Dist. Atty., Kay Kirkpatrick, Dennis Weber, Asst. Dist. Attys., for State.
Robert J. Roux, Office of Public Defender, Jeff C. Calmes, Baton Rouge, for Duncan.
MARCUS, Justice.
Janice Pautard (a/k/a Janice Rigsby) and Johnny Duncan were charged in the same information with possession of Diazepam, a controlled dangerous substance, in violation of La.R.S. 40:969(C). Duncan filed a motion to suppress the evidence which was joined in by Pautard.[1] Following an evidentiary hearing, the trial judge denied the motion to suppress. Defendants withdrew their former pleas of not guilty and entered pleas of guilty as charged, reserving the right to appeal the ruling of the trial judge denying the motion to suppress. State v. Crosby, 338 So.2d 584 (La.1976). After determining that the pleas were made voluntarily and with an understanding of the nature of the charges, the trial judge accepted the pleas of guilty. A presentence *910 investigation was ordered. Pautard was sentenced to serve three years at hard labor. The judge suspended the sentence and placed her on active probation for three years with special conditions. The court of appeal affirmed the conviction and sentence.[2] Duncan was sentenced to serve three years at hard labor. His sentence was also suspended and he was placed on active probation for a period of five years with special conditions, one of them being that he serve four months in the parish jail. His conviction and sentence were also affirmed by the court of appeal.[3] Upon applications by defendants, we granted certiorari and consolidated the cases to review the correctness of the denial of the motion to suppress.[4]
Evidence adduced at the suppression hearing reveals that about 3:00 a.m. on March 26, 1983, Sergeant Phillip Hilbun of the Baton Rouge Police Department was patrolling the north Baton Rouge area when he observed a white Chevrolet with two Caucasian occupants, a male driver and a female passenger, parked at a closed service station at the intersection of 38th and Cain Streets. Sergeant Hilbun, a thirteen-year veteran of the police force, had been working the north Baton Rouge area for six or seven years. He testified that the location, sometimes referred to by residents as the "shooting gallery," had a reputation as a narcotics-trafficking area. Sergeant Hilbun circled the block in his police unit and then concealed his vehicle and himself from view behind some bushes approximately 150 to 200 feet from the Chevrolet. From this position, Sergeant Hilbun observed a black male approach the driver's side of the Chevrolet and converse with the occupants for a couple of minutes. He further testified that because it was dark and he was not very close, he did not see if any specific items passed between the black male and the occupants of the vehicle. The black male then turned and walked away. As the vehicle started up to drive away, the occupants observed the police officer. Sergeant Hilbun testified that he tried to get them to stop but the vehicle went a few blocks, turned right, went another few blocks and again turned right before finally stopping on Pritcher Street behind the Gus Young Community Center. During pursuit of the vehicle, Sergeant Hilbun radioed for a backup unit, informing the unit that it appeared that the passenger, Janice Pautard, was eating something and he was concerned that she was destroying evidence. Officers Wilson and Causey responded to the radio call. Officer Wilson testified that when he approached, the Chevrolet was already coming to a stop, and Sergeant Hilbun was behind it with his red lights on.
Sergeant Hilbun noticed that the Chevrolet had an out-of-state license plate. He then told the driver, Johnny Duncan, to exit the vehicle. After observing that Duncan was unarmed, Sergeant Hilbun asked him for identification. As he approached the vehicle, he detected the aroma of marijuana smoke in the vehicle. The defendants were advised of their Miranda rights. When Sergeant Hilbun commented on the smell of marijuana, Pautard stated that the couple had smoked marijuana earlier in the evening at Larry's PoBoy Restaurant. Sergeant Hilbun also noticed that Duncan had several cash bills protruding from his shirt pocket. The officers requested permission to search the vehicle. Duncan gave his consent. No contraband was found in the vehicle.
After the search of the vehicle, defendants were advised again of their Miranda rights. Sergeant Hilbun frisked Duncan for a dangerous weapon but none was recovered. He then told Duncan of his suspicions and requested permission from him to search his boots. Duncan consented and removed his boots. A single pill was recovered from within Duncan's sock. Pautard *911 also gave her permission to the officers to search her purse and handed it over to Officer Wilson. A single pill was found in a change purse or cigarette holder in her purse. During this time, Pautard made several statements. She stated that they had come to the area to purchase narcotics but the deal did not go through and that they had been "ripped off" there once before. She also admitted that they had purchased the two pills at Larry's PoBoy Restaurant earlier in the evening.[5] Both defendants were arrested. An analysis of the pills revealed that they were Diazepam (Valium), a Schedule IV controlled dangerous substance.
Defendants contend that Sergeant Hilbun possessed neither reasonable cause to believe that they were committing an offense to justify an investigatory stop nor probable cause to arrest when he stopped their vehicle. They further contend that the consent to search the vehicle and their persons and belongings was either coerced or was tainted by the illegal stop or arrest. We find that the investigatory stop was legal and the consent to search was freely and voluntarily given by defendants. For these reasons, we find, as did the court of appeal, that the trial judge correctly denied the motion to suppress the evidence.
The fourth amendment to the federal constitution and art. 1, § 5 of the Louisiana constitution protects people against unreasonable searches and seizures. However, the right of law enforcement officers to stop and interrogate one reasonably suspected of criminal conduct is recognized by La.Code Crim.P. art. 215.1, as well as both the federal and state jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984); State v. Andrishok, 434 So.2d 389 (La. 1983). We have held that reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is, or is about to be engaged in criminal conduct. State v. Belton, supra; State v. Andrishok, supra.
Sergeant Hilbun was an experienced police officer, having served thirteen years with the Baton Rouge Police Department at the time of the detention and arrest. At least six of these years were spent patrolling the area of 38th and Cain and Sergeant Hilbun knew of its reputation as a drug-trafficking area. At 3:00 a.m., he observed a black male approach two white persons in a vehicle parked in a closed service station. After the person departed and the occupants of the vehicle noticed Sergeant Hilbun, they quickly exited the area and did not stop until they were pulled over by Sergeant Hilbun several blocks away. During the pursuit, Sergeant Hilbun radioed to a backup unit that he saw the passenger eating something, and he was concerned that evidence was being destroyed. We conclude that Sergeant Hilbun's knowledge of these facts, in conjunction with the reasonable inferences drawn therefrom, was sufficient to give a trained police officer reasonable cause to believe that defendants were engaged in criminal conduct. Hence, the subsequent investigatory stop of defendants was legal.
Having found a legal investigatory stop, we now must determine if the subsequent searches of defendants' persons and belongings and seizure of evidence were lawful.
It is well settled under the federal and our state constitutions that a search conducted without a warrant issued upon probable cause is per se unreasonable subject *912 only to a few specifically established and well-delineated exceptions. One of the specifically established exceptions to both a warrant and probable cause is a search conducted pursuant to consent. When the state seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving the consent was given freely and voluntarily. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Owen, 453 So.2d 1202 (La.1984); State v. Bourgeois, 388 So.2d 359 (La.1980).
After defendants were advised of their Miranda rights, Duncan gave his consent to search the vehicle. Nothing was recovered. Defendants were again advised of their Miranda rights, and after the officers voiced their suspicions, Duncan consented to a search of his boots and removed them, and Pautard gave Officer Wilson her permission to search her purse and handed it over. The drugs in question were seized as a result of these searches. Pautard freely admitted that they had smoked marijuana and purchased the pills earlier in the evening and that they had come to the area to purchase narcotics. The officers stated that defendants seemed more than willing to cooperate "for whatever reasons of their own." We thus conclude that both Duncan and Pautard freely and voluntarily consented to the searches of their persons and belongings; hence, their consent was valid. The seizure of evidence resulting therefrom was lawful. The court of appeal correctly affirmed the trial judge's denial of the motion to suppress.

DECREE
For the reasons assigned, the convictions and sentences of defendants are affirmed.
DIXON, C.J., and DENNIS, J., dissent.
CALOGERO, J., dissents and assigns reasons.
CALOGERO, Justice, dissenting.
A lynchpin of the majority's opinion is consent to search. They find that defendants voluntarily consented, as the officer said, "for whatever reason of their own." The obvious reason is that under the circumstances they did not have a choice. They were chased by a police car at 3:00 a.m. in the morning and forced to stop their vehicle. And contrary to the state's contention, they were not told that they did not have to give consent to the search.
The only testimony on the latter point was elicited from Officer Wilson who conducted the search of Ms. Pautard. He testified that Sergeant Hilbun advised her that she could withhold her consent. However, Sergeant Hilbun testified only that he advised Ms. Pautard of her Miranda rights and "made sure that [the defendants] absolutely understood what [the officers] were looking for." There is a similar absence of evidence indicating that Johnny Duncan was informed prior to the search of his boots that he could withhold his consent.
Furthermore, consent does not validate a search in every instance. In State v. Raheem, 464 So.2d 293 (La.1985), this Court ruled that:
"[W]hen made after an illegal detention or search, consent to search, even if voluntary, is valid only if it was the product of a free will and not the result of an exploitation of the previous illegality. Among the factors considered in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." (citation omitted).

Id., 464 So.2d at 297.
At the least any consent by these defendants was not sufficiently attenuated from the stop and seizure, to be a product of a free will. If unlawful, and since nonconsensual, the search was illegal.
*913 This stop and seizure was unlawful. The majority contends otherwise, and relies chiefly on La.C.Cr.P. art. 215.1, ("A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.")
But Officer Hilbun in this case saw nothing transpiring at the intersection of 38th and Cain indicating that the car's occupants had committed an offense, nor, as they departed the suspect intersection that they were about to commit an offense.
And the point in time for ascertaining whether the officer had reasonable suspicion, or reasonable cause to stop the vehicle was not as the defendants' car rolled to a stop (which is essentially what the majority says) but when the officer took out in pursuit.[1] A stop is effectuated when a citizen is actually detained or when some form of detention is imminent. See State v. Belton, 441 So.2d 1195 (La.1983); State v. Andrishok, 434 So.2d 389 (La.1983); State v. Chopin, 372 So.2d 1222 (La.1979).
In State v. Chopin, 372 So.2d 1222 (La. 1979), this Court determined that some form of official detention was imminent when the police drove past a walking defendant, turned around and came back toward him, turned on the bright lights and stopped three to four feet in front of him.
In State v. Saia, 302 So.2d 869 (La.1974) the police pulled their car up beside defendant who had just left a house known to be a drug outlet. That stop was held to be invalid because the officers acted before they saw the glassine envelope in the defendant's hand. In essence they approached her because she had exited a residence that police suspected was an alleged drug outlet, had "put her hand inside the waist band of her pants and had turned and walked back toward" the residence she had just left.
The facts of this case closely resemble those of State v. Williams, 421 So.2d 874 (La.1982)[2].
The search in Williams was held valid because it was found that the stop did not take place until the officer's hunch had flowered into reasonable suspicion. The court nonetheless stated that mere suspicious activity is not a sufficient basis for police interference with an individual's freedom, and that the officers did not have reasonable cause for an investigatory stop upon their midnight approach of an automobile near a public housing project, even after observing one individual momentarily reaching inside the automobile. These circumstances *914 "provided little more than a `hunch' on the part of the officer that a drug transaction had taken place."
This case is not unlike two landmark cases handed down by the United States Supreme Court. In Sibron v. State of New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) a police officer observed a man in a high drug area engaged at various time in conversation with six or eight persons whom he knew from past experience to be narcotics addicts. The officer then followed the defendant into a restaurant and after seeing him converse with three more known drug addicts, asked him to step outside. Once outside the officer searched the defendants pockets and discovered glassine envelopes which contained heroin. The Court concluded that this search was unreasonable and rendered the heroin inadmissible. In so holding the court stated:
The officer in this case ... was not acquainted with Sibron and had no information concerning him. He merely saw Sibron talking to a number of known narcotics addicts over a period of eight hours. "It must be emphasized that Patrolman Martin was completely ignorant regarding the content of these conversations, and that he saw nothing pass between Sibron and the addicts. So far as he knew, they might indeed have been talking about the World Series." "The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individuals personal security." Nothing resembling probable cause existed.
In this case, Officer Hilbun was not acquainted with the defendants. He did not know the substance of the conversation he observed, and he witnessed nothing pass between the defendants.
In Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) the Supreme Court reiterated the standard that officers must have a reasonable suspicion based on objective facts that the individual is involved in criminal activity. In Brown the officer stopped an individual in the alley of area which has a high incidence of drug traffic. The officer said he stopped the defendant because the "situation looked suspicious and we had never seen the subject in that area before." The Court found that none of the circumstances preceding the officers detention of defendant justified a reasonable suspicion that he was involved in criminal conduct. But more importantly the court stated that because the defendant "was in a neighborhood frequented by drug users, [that] standing alone, is not a basis for concluding that defendant himself was engaged in criminal conduct." 443 U.S. at 52, 99 S.Ct. at 2641.
The case under consideration is even less favorable to the state than State v. Williams, supra, for here there was not observed any exchange, nor any reaching into the car. Detention appeared imminent when the police officer activated his emergency lights[3] and set out in pursuit of the suspicious vehicle. This took place just after the vehicle departed the service station. At that point the police sergeant knew only that two unknown occupants of a parked automobile had a brief 3:00 a.m. conversation with an unknown black male at a location known to be a narcotics "shooting gallery." The three individuals made uneventful departures from the service station when the conversation ended.
It was six blocks into the pursuit, after Sergeant Hilbun had radioed for assistance and unsuccessfully attempted to stop the vehicle for "some time," that he observed the female passenger consume an unknown substance.
Officer Hilbun was without reasonable cause at the time defendants departed the *915 service station and he set out in pursuit. The circumstances surrounding Duncan and Pautard's late night conversation provided no more than a "hunch" that the couple had engaged in a drug transaction. And while Officer Hilbun might have had a reasonable belief that a felony was about to be committed as he watched the vehicle's two occupants speak briefly with the pedestrian, a belief which surely dissipated when the brief encounter ended without exchange, there surely was no reasonable belief that the car's occupants were about to commit a felony or misdemeanor when the stop effectively took place, i.e., at the point at which the vehicle departed and the officer took up pursuit. Furthermore, Hilbun's hunch that a crime had been committed was even less substantial than that possessed by the officers in Williams, as Hilbun did not have the benefit of observing any physical motion arguably indicating that a transfer of narcotics had occurred.
As we have held on previous occasions, mere suspicious activity (or mere presence in a drug area) is not a sufficient basis for police interference with an individual's freedom. State v. Williams, 421 So.2d 874 (La.1982); State v. Truss, 317 So.2d 177 (La.1975); State v. Finklea, 313 So.2d 224 (La.1975); State v. Saia, 302 So.2d 869 (La.1974).
The automobile stop was illegal and the evidence discovered as a product of that illegal stop unlawfully seized.
For the foregoing reasons, I dissent.
NOTES
[1] Pautard did not file a motion to suppress, but minute entry on date of the suppression hearing states that the motion to suppress filed by Duncan's retained counsel was joined in by the public defender representing Pautard. We will treat the matter, as did the court of appeal, as if Pautard actually filed a motion to suppress.
[2] State v. Pautard, 470 So.2d 596 (La.App.1st Cir.1985).
[3] State v. Duncan, 470 So.2d 600 (La.App.1st Cir.1985).
[4] State v. Pautard, 476 So.2d 337 (La. 1985), and State v. Duncan, 477 So.2d 694 (La. 1985).
[5] According to the testimony of Officer Wilson, a second search of Pautard's purse at the police station produced either one or two additional pills. A copy of the Scientific Analysis Report refers to two white tablets determined to contain Diazepam.
[1] The only major dispute I have with the majority's facts is their saying that defendants' vehicle "quickly exited the area." There is no support in the record for that statement.
[2] The events which resulted in Williams' arrest were the following: About midnight on April 14, 1981, while on a routine patrol in an unmarked vehicle in the vicinity of the Lafitte Housing Project, Officers Wininger, Kuhn and Gifford of the New Orleans Police Felony Action Squad saw a car parked in the 1800 block of Orleans Avenue and occupied by two men, with three men standing outside the car on the passenger side. After circling a few blocks, the officers returned, parked about one hundred yards behind the vehicle to observe the group for five or ten minutes. During this brief surveillance, the officers saw at least one of the men reach his hand in to the car and then retract it in a manner which prompted the officers to suspect that a drug transaction was taking place. Officers Kuhn and Wininger neared the scene in the patrol car; Officer Gifford approached on foot. Thereupon the three persons standing by the car started walking away very quickly, leaving the defendant seated at the wheel with a passenger next to him in the front seat. One of those leaving on foot put his hand to his mouth and starting swallowing something. Officer Gifford ordered the three men to stop. Simultaneously, the defendant started his car in an apparent effort to leave the scene. Officer Kuhn pulled the police car in front of the defendant's vehicle, preventing his departure. Officers Kuhn and Wininger exited their car, identified themselves and asked the defendant and his passenger to get out of the car. As the passenger did so, Officer Wininger saw a revolver on the floorboard of the car, protruding halfway from under the front seat. He seized it. When it was determined that the gun belonged to Melvin Williams and that Melvin Williams was a convicted felon, he was arrested and charged with violating La. R.S. 14:95.1.
[3] It is at least probable that Officer Hilbun illuminated the red emergency lights atop his police unit at the outset of his pursuit, inasmuch as those lights were on when Officers Wilson and Causey arrived at the scene of the stop, and considering that Officer Hilbun testified "... I was trying to get them to stop but they didn't for some time.".