561 So.2d 170 (1990)
STATE of Louisiana
v.
Carl SCOTT.
No. 88 KA 1199.
Court of Appeal of Louisiana, First Circuit.
April 10, 1990.
Bryan Bush, Dist. Atty., Baton Rouge by Stephen Pugh, Asst. Dist. Atty., for plaintiff-appellee.
Gail H. Ray, Baton Rouge, for defendant-appellant.
*171 Before CARTER, SAVOIE and ALFORD, JJ.
CARTER, Judge.
This matter is before us on remand from the Louisiana Supreme Court. State v. Scott, 551 So.2d 1310 (La.1989). The only issue presented for our review is the trial court's ruling denying defendant's motion to suppress physical evidence. The Louisiana Supreme Court remanded this matter to us for reconsideration and full treatment of an investigatory stop and resultant search.
Defendant was charged with the possession of cocaine, a violation of LSA-R.S. 40:967C. He filed a motion to suppress several packages of cocaine found on his person during a search incident to his arrest on a weapons charge. After a hearing, the trial court denied the motion to suppress, and defendant sought review of that ruling. This court denied defendant's application for writs. State v. Scott, KW 87 1689. Defendant sought further review to the Louisiana Supreme Court, and that court also denied his application for supervisory relief. State v. Scott, 520 So.2d 429 (La.1988).
After the supreme court's action, defendant waived his right to a jury trial and elected to be tried before the bench on this charge. The parties agreed to submit the matter on the records of the pretrial hearings and the scientific analysis reports. Defendant was convicted as charged, and the trial court imposed a suspended sentence.
Defendant appealed his conviction, urging in his only briefed assignment of error that the trial court erred in denying his motion to suppress. Defendant's appellate brief was virtually identical to the writ application previously filed and rejected by this court. In the appellate opinion, we noted that our pretrial ruling did not absolutely preclude a different decision on appeal; but, nevertheless, judicial efficiency demanded that we accord great deference to our pretrial ruling. State v. Scott, 543 So.2d 631 (La.App. 1st Cir.1989). In obtaining this result, we relied upon State v. Humphrey, 412 So.2d 507 (La.1982), on rehearing, wherein the Louisiana Supreme Court found as follows:
When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.
[412 So.2d at 523].
Thereafter, we noted that no further evidence had been adduced at trial, and, we adhered to our original finding that the court's ruling denying defendant's motion to suppress was correct.
In its order remanding this matter, the court referenced State v. Fontenot, 550 So.2d 179 (La.1989), wherein the court found an error of law in the determination of the Fifth Circuit that reconsideration of the defendant's complaint of the trial court's denial of a motion to suppress evidence was barred by its pretrial denial of supervisory review of the same issues. Therein, the court noted as follows:
A denial of supervisory review is merely a decision not to exercise the extraordinary powers of supervisory jurisdiction, and it does not bar consideration on the merits of the issue denied supervisory review, when appeal is taken from final judgment. [citations omitted] Thus, the ruling denying supervisory writs does not bar reconsideration of the issue on appeal and ... reaching a different conclusion as to it.
[550 So.2d at 179].
We are mindful that a pretrial denial of an application for supervisory relief is not equivalent to a pretrial grant of review, as was considered in State v. Humphrey. As *172 previously noted, in our earlier consideration of this appeal we specifically found that further review was not barred by our pretrial denial of supervisory relief, and we found that a different result was not absolutely precluded upon appeal. We further found, however, that our earlier determination was entitled to deference. Since no additional evidence relating to this issue was adduced at the trial, and no new argument was raised to this court, we affirmed the trial court's ruling denying defendant's motion to suppress.
The Louisiana Supreme Court has now remanded this matter to us for "reconsideration and full treatment of the stop and search." Accordingly, we review the denial of defendant's motion to suppress on the record of the pretrial hearings.
Defendant was apprehended by Sgt. Michael Dickinson of the Baton Rouge City Police Department near the intersection of Odell and 39th Streets, an area notorious for drug trafficking. While on patrol with two other units of the Baton Rouge Metro Squad, Sgt. Dickinson noticed defendant standing in the middle of Odell Street, conversing with another black male. The incident occurred on March 13 in the early evening hours, approximately 7:30 p.m. As the police units approached, one of the men signalled their arrival. Apparently in response to that signal, defendant's companion ran into a nearby grocery store, and defendant began to walk rapidly down 39th Street. Sgt. Dickinson instructed the second unit to stop the man who ran into the grocery store, and he pursued defendant.
Sgt. Dickinson stopped defendant and initiated an "informal conversation" with him. During a brief frisk for weapons, Sgt. Dickinson recovered a .357 handgun that was stuck in defendant's belt. Sgt. Dickinson jokingly asked defendant if he had any other guns, and defendant replied that he did. Sgt. Dickinson recovered another handgun from the pocket of defendant's trousers. Both of the guns were loaded.[1]
Sgt. Dickinson then arrested defendant for a "weapons charge." During a search incident to the arrest, Detective Denicola, also of the Metro Squad, found several clear plastic baggies of suspected cocaine in the brim of defendant's hat, and another packet, covered with a dollar bill, in defendant's shirt pocket.
During the hearing on defendant's motion to suppress, Sgt. Dickinson related that, in this area, he had personally made over forty arrests for drug-related offenses. He further testified that many of the arrests resulted from drug transactions made in the middle of the street and that most of the drug transfers in that area occurred in the middle of the street. Finally, he noted that it appeared to him that a *173 transaction was occurring which the men clearly wished to conceal.
In determining that the initial stop was valid, the trial court found that Sgt. Dickinson's attempt to approach defendant was authorized by LSA-C.Cr.P. art. 215.1. Thereafter, defendant's flight to avoid the encounter confirmed Sgt. Dickinson's belief that criminal activity was underway.
LSA-C.Cr.P. art. 215.1 provides for the temporary questioning of persons in public places, in pertinent part, as follows:
A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
See also Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case by considering whether or not the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. The totality of circumstances must be considered in determining whether or not reasonable cause exists. In order to assess the reasonableness of an officer's conduct, it is necessary to balance the need to search or to seize against the harm of invasion. State v. Payne, 489 So.2d 1289 (La.App. 1st Cir.1986), writ denied, 493 So.2d 1217 (La.1986). The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is, or is about to be engaged in criminal conduct. State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). However, all of the information in the possession of police is to be considered in the determination of whether or not probable cause existed for the arrest. State v. Buckley, 426 So.2d 103 (La.1983). The quantity and quality of evidence needed for probable cause are measured by lesser standards than those for conviction of the defendant at trial. State v. Buckley, supra. See also Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
The nature of the area of suspected criminal activity is relevant to a determination of probable cause. State v. Sterling, 479 So.2d 641 (La.App. 1st Cir.1985), writ denied, 482 So.2d 626 (La.1986). The reputation of an area is an articulable fact upon which a police officer may legitimately rely. State v. Buckley, supra; State v. Sterling, supra. See also United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Such so-called high crime areas are places in which the character of the area gives color to conduct which might not otherwise arouse the suspicion of an officer. State v. Buckley, supra.
Sgt. Dickinson was an experienced police officer, having served fifteen years with the Baton Rouge Police Department. He had patrolled this area extensively, evidenced by the large number of arrests for drug trafficking that he had made in this vicinity. This area was notorious as the "shooting gallery" and had a reputation as a narcotics trafficking area. See State v. Pautard, 485 So.2d 909 (La.1986); State v. Sterling, supra.
Although defendant characterizes his conduct as innocuous and innocent, his behavior was, in fact, sufficiently notorious to draw the attention of these patrolling officers, and, it likely constituted an illegal obstruction of a public street. See LSA-R.S. 14:100.1. In any event, by conversing in the middle of a street after dusk, defendant and his companion created a significant risk to themselves as well as to vehicular traffic. We note that, in any area of the city, such conduct could give rise to grounds for police officers to determine the reasons for the activity, to determine if assistance was necessary, or to request that the pedestrians leave the roadway to converse.
Although flight, nervousness, or a startled look at the sight of a police officer is, by itself, insufficient to justify an investigatory *174 stop, this type of conduct may be highly suspicious and, therefore, may be one of the factors leading to a finding of reasonable cause. State v. Belton, supra. In this notorious area, where Sgt. Dickinson was aware that narcotics transactions frequently occurred in the middle of the roadway, defendant's actions in conversing in the roadway, as well as his response to the oncoming police cars by attempting to conceal his activities and flee, gave rise to reasonable grounds for Sgt. Dickinson to stop him and demand an account of his activities.
On cross-examination, Sgt. Dickinson related his motive for stopping defendant, as follows:
Q. Now did I understand you to say that you initially stopped him to just sort of have an informal conversation?
A. No, that is basically how we were talking once I stopped him. My motive was to stop him and pat him down for weapons and seeuh identify him and see if there was any kind of mitigating circumstances to talk to him further and what would happen. But it was informal conversation when I walked up by myself with him.
Defendant claims that this testimony indicates that Sgt. Dickinson had no valid reason for the investigatory stop. However, the officer had previously related his suspicions and the grounds therefor. Based upon the reasonable suspicion of a trained police officer, familiar with a notorious area and the methods used to conduct drug transactions in that area, Sgt. Dickinson was authorized to demand defendant's identity and an explanation of his actions.
Defendant further contends that Sgt. Dickinson had no grounds to suspect that defendant might have been armed. Thus, his expressed motive "to stop him and pat him down for weapons" was unreasonable. However, Sgt. Dickinson testified that the evening was balmy, and most of the individuals he saw in the area wore short-sleeved clothing.[2] Despite the weather, defendant was dressed in a full-length trench coat and hat.
In order to justify a brief frisk for weapons during the course of an investigatory search, a police officer need not be absolutely certain that the individual is armed. The issue is whether or not a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. In determining whether or not the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. Terry v. Ohio, supra.
At the time of the initial stop, Sgt. Dickinson had observed the conduct of defendant and his companion, as well as the manner in which defendant was dressed, and it appeared to him that a drug transfer was imminent. Sgt. Dickinson was alone with defendant. Given his own extensive experience and the notorious area, as well as defendant's unusual behavior and his anomalous attire, Sgt. Dickinson was justified in patting defendant's outer clothing to insure his own safety during the brief encounter. Thereafter, the discovery of a loaded weapon in defendant's belt and defendant's admission that he had another weapon on his person gave grounds for a more thorough search, ultimately leading to defendant's arrest for a "weapons charge."[3]
*175 We find, therefore, that Sgt. Dickinson had reasonable suspicion of criminal activity to justify the initial investigatory detention of defendant and a brief pat-down search for concealed weapons. Accordingly, we find the cocaine found on his person during the search incident to his arrest was not the result of an illegal seizure. This assignment of error has no merit.
For the above reasons, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Sgt. Dickinson testified on direct examination as follows:

Q. How did you have occasion to come in contact with Mr. Scott?
A. We were driving west on Odell Street. There was at least three vehiclesuhI was in the lead vehicle. I saw Mr. Scott standing in the middle of Odell Street just prior to its intersection with 39th, North 39th Street. He was having a conversation with another black male subject. Mr. Scott was dressed in a long trench coat. The subjects saw me driving toward themuhat which time the other subject ran into the grocery store which is located at the south east corner of 39th and Odell. Mr. Scott then walked north on North 39th Streetuhwhere he was later stopped by me.
Q. Did there appear to be any verbal exchange between the two when they spotted you?
A. Yes.
Q. And that is when they split up?
A. Right.
Q. What did you then do?
A. I radioed to the people following me to stop the subject who ran in the store and thenuhI turned right on Northon Odell Streetuhon North 39th Street, rather, and I stopped Mr. Scott. Basically, I was having an informal conversation with him and I patted him down for weapons and location (sic) a .357 Tarrus, I think, was stuck in his pants belt and I asked him jokingly if he had any more weapons. He said, yeah, he had another one in his pants pocket, in his back right rear pants pocketuhwhich I removed. At that time I patted him down further and didn't find any more weaponsuhbut I was by myself at the timeuhso I just placed him in the vehicle and brought him back to the rest of the officers who had stopped on Odell Street to chase down the other subject that ran offuhat which time we brought him back and got him back out of the car and searched him further.
[2] Sgt. Dickinson testified on cross-examination as follows:

Q. What time of day or night was this?
A. I think it was about 7:30 p.m. At that time of the year I think it had just gotten dark.
Q. And what time of year was it?
A. Pardon me?
Q. When was it?
A. It was March the 13th, I believe.
Q. It was still a little cool?
A. It really wasn't. Everybody else had short sleeves on.
[3] Although he testified that Det. Denicola searched defendant after Sgt. Dickinson arrested him "for the weapons," Sgt. Dickinson did not indicate the specific weapons charge on which defendant was arrested. Clearly, however, if Sgt. Dickinson saw the weapon on defendant's person, he had grounds to stop him and ask for the purpose of the firearm, and, if the firearm was secreted, Sgt. Dickinson had grounds to arrest defendant for the possession of a concealed weapon. See LSA-R.S. 14:95.