592 So.2d 1352 (1991)
STATE of Louisiana
v.
Lawrence J. BARNES.
No. 91-KA-536.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1991.
*1353 Dorothy Pendergast, Asst. Dist. Atty., Gretna, for plaintiff/appellee.
John D. Rawls, Indigent Defender Bd., Gretna, for defendant/appellant.
Before BOWES, GRISBAUM and DUFRESNE, JJ.
BOWES, Judge.
Defendant, Lawrence J. Barnes, is before this Court after pleading guilty to ten counts of armed robbery, on appeal of the denial of his pretrial motions under the authority of State v. Crosby, 338 So.2d 584 (La.1976). We affirm.

*1354 FACTS
Beginning in November 1988 a series of armed robberies took place in the residential neighborhoods surrounding West Esplanade in Metairie and Kenner, Louisiana. The robbers were identified by their victims as two black males of slender build, one taller than the other. The victims further agreed that the perpetrators would approach their targets at night, as they exited their cars upon returning home; and after robbing them at gunpoint of their jewelry, money and other items, the perpetrators would depart from the scene in an old car, generally further described as light blue, dark blue or gray.
In response to this rash of robberies, the Jefferson Parish Sheriff's Office formed a robbery task force which positioned units at various locations in the vicinity of the robberies, around the area of West Esplanade, on the night of March 30, 1989. In their attempt to apprehend the perpetrators, the officers were instructed to stop only old model light colored vehicles and to detain only occupants who fit the general description given by the victims, i.e., two slim black men. Throughout the night the officers stopped several light colored old model cars with occupants fitting this description. However, all were allowed to proceed except the defendant's car. We note, importantly, that it is shown by the testimony of the officers that, a number of cars with black male occupants were not stopped because the cars were late model autos or did not fit the described vehicle.
That night at approximately 10:45, the defendant and Troy Lastie were proceeding west on West Esplanade in an old model light blue Oldsmobile. As they passed the intersection of West Esplanade and Transcontinental, Officer Judy Rice, who was stationed near the intersection in an unmarked unit, was alerted to their passage having observed the car and the occupants as two black males. However, she testified that she could not obtain the car's license plate number because there was no tail lamp illuminating it, which fact, she realized constituted a traffic violation, sufficient in itself to stop the vehicle. Officer Rice attempted to follow the car, but the heavy traffic on West Esplanade impeded her pursuit. After broadcasting a description of the car and its occupants and the fact of its unlit, unreadable license plate to the assisting units, she was eventually able to proceed; however, she soon lost sight of the Oldsmobile in the vicinity of the intersection of West Esplanade and Power Boulevard and so radioed the assisting units of that fact.
After receiving Officer Rice's advisement that she had lost the Oldsmobile, Officers Susan Rushing and Gilbert Breaux, who were proceeding in another unit to back up Officer Rice, lagged back in the area of Transcontinental and West Esplanade hoping to catch sight of the vehicle. As they entered a U-turn lane they observed an old Oldsmobile with an unlit, unreadable license plate, which they believed to be the car about which Sgt. Rice had just given them the broadcast, emerge from the opposite U-turn lane, circle back, and head slowly west again on West Esplanade. This action and these circumstances were termed "awfully suspicious" by Officer Rushing and suggested to her that they were "casing an area." Accordingly, she proceeded to back her unit out of the U-turn lane and pursue the Oldsmobile. Just prior to stopping the car, she noticed that the passenger was bent over and "fixated with the floorboard of that passenger area." Shortly thereafter, she stopped the Oldsmobile by using the unit's blue strobe light.
Immediately upon stopping, the defendant stepped out from the driver's side and approached Officer Rushing, who had also exited her unit. The passenger, (later determined to be Lastie) remained in the car, his preoccupation with the floorboard becoming even more pronounced. For the security of their own safety, the officers instructed Lastie to exit the car. At the rear of the car the officers performed a pat down search on each occupant for weapons *1355 which revealed nothing. The officers then asked the men for identification, but neither had any.
After the assisting units arrived, Officer Rushing approached the Oldsmobile on the driver's side. The window was rolled down and the motor was still running. Upon looking inside the car with a flashlight, she observed protruding slightly from under the passenger's seat the brown handle of what appeared to be a handgun. She proceeded to the passenger side and opened the door. Her suspicion and observation were correct. She reached in and removed the gun. She also observed in the open ashtray several pieces of jewelry including a Seiko watch.
Meanwhile, Officer Guillory had arrived with a composite sketch of one of the perpetrators which the officers found resembled Lastie.
In response to questioning concerning their whereabouts, the two men gave differing stories. The defendant stated that, due to mechanical difficulties, he was driving around in the area to be sure that his car was operating correctly, while Lastie indicated that they had been in a housing project in New Orleans where he had just purchased the handgun and they were proceeding from there toward Kenner.
Because of the discrepancies in their stories, their resemblance to the general descriptions given to the officers and Lastie's resemblance to the composite sketch, the officers asked the two men if they would be willing to voluntarily accompany them to the First District Police Station for further questioning and both agreed. Thereafter, the officers requested a tow truck to move the old Oldsmobile. Prior to their departure, the men were allowed to remove from the car such jewelry as each claimed to own.
Subsequently, the men were transported to the police station where the defendant confessed to his involvement in the various robberies.
Thereafter, the defendant, along with Lastie, was charged by bill of information with 15 counts of armed robbery. At arraignment the defendant pled not guilty to the charges. Later, the defendant filed motions to suppress identification made in his confession and certain evidence which the trial court denied following hearings.
The defendant, alone, proceeded to a jury trial on 6 of the 15 counts. After the State presented its case, on the following morning when the trial court took up the case, the defendant, out of the presence of the jury, withdrew his former plea of not guilty and pled guilty to 10 counts of armed robbery while reserving his right to appeal the denial of his pre-trial motions in accordance with State v. Crosby, supra. Thereafter, the trial court sentenced the defendant to 50 years at hard labor without benefit of parole, probation or suspension of sentence on each count with the sentences running concurrently.
The trial court granted defendant an out of time appeal and ordered Indigent Defender Board to have someone represent the defendant for appellate purposes.

ISSUES OR ASSIGNMENTS OF ERROR
On appeal, the defendant urges that he was arrested as a result of an illegal stop; that lineup identifications were tainted; and that the State abandoned its prosecution on all but six counts of armed robbery.

ANALYSIS

INVESTIGATORY STOP
The defendant contends that there was no reasonable suspicion for an investigatory stop of defendant's vehicle because, he alleges, he was stopped as part of a general roadblock policy directed against all black males traveling together on a major highway which passed several white residential neighborhoods. In support of this contention, defendant cites State v. Church, 538 So.2d 993 (La.1989) and State v. Parms, 523 So.2d 1293 (La.1988), cases which involved DWI roadblocks. For reasons stated hereinafter, we do not find *1356 these cases controlling or on point for the situation before us.
When law enforcement officials stop a vehicle and detain its occupants, the action constitutes a "seizure" under the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); State v. Church, supra. However, the right of law enforcement officers to stop and interrogate one reasonably suspected of criminal conduct is recognized by LSA-C.Cr.P. art. 215.1, as well as by both state and federal jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Pautard, 485 So.2d 909 (La.1986). Reasonable cause for an investigatory stop is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. State v. Pautard, supra; State v. Rosales, 537 So.2d 850 (La. App. 5 Cir.1989). [Emphasis ours]. The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is, or is about to be engaged in criminal conduct. State v. Pautard, supra. On the night in question here, in addition to the facts described above, the officers knew that a series of armed robberies had occurred in the area under surveillance in recent months and the perpetrators were two slim black males, one taller than the other, who would rob their victims as they alighted from their cars after arriving home. The perpetrators would then depart in an old car generally described as light colored with an unlit or unreadable license plate. All of these factors properly incited the suspicion of the officers.
Defendant's reliance on State v. Church, supra, and State v. Parms, supra, is misplaced because defendant's vehicle was not stopped as part of a roadblock directed against only blacks. Rather, in accordance with instructions from their superior, the officers stopped the defendant's vehicle, and the other vehicles that they stopped, only because they fit a description of the get-away vehicle involved in the robberies; and they were to detain only the occupants who fit the description of the perpetrators. These facts are borne out and verified by the testimony in the record to this effect and also to the effect that other vehicles containing blacks were not stopped. Furthermore, we note, in particular, that the defendants were stopped primarily because their vehicle had an unlit and unreadable license plate which the officers realized was a traffic violation (LSA-R.S. 32:304) and they were detained in conjunction with their conformity to the general description of the robbers.
In State v. Turner, 500 So.2d 885 (La. App. 1 Cir.1986), there was reasonable cause to stop a car which matched the description of the vehicle used to flee the scene of a robbery committed several minutes earlier. There the court stated:
... the officer, by communicating with other officers at the crime scene, diligently pursued a means of investigation which was likely to confirm or dispel his suspicions quickly. See State v. Borning, 477 So.2d 134 (La.App. 1 Cir.1985), writ denied, 481 So.2d 1330 (La.1986). Essentially, the detaining officer effected a brief stop of suspicious individuals to maintain the status quo momentarily while obtaining more information. The suspects were not transported from the scene, and the police appear to have diligently pursued a means of investigation likely to resolve the matter expeditiously. Under the circumstances, the detention was reasonable as to cause, method and duration. See State v. Fauria, 393 So.2d 688 (La.1981).
The same can be said of the officers in the case before us. See also State v. Louis, 496 So.2d 563 (La.App. 1 Cir.1986).
Consequently, we hold that the officers had reasonable cause to halt and detain the defendant's car for an investigatory stop.
*1357 This contention of defendant is without merit.

IDENTIFICATION
The defendant further alleges that the trial court erred in denying his motion to suppress the identification in that the line-up identification was tainted by the publication and broadcast of the defendant's and his accomplice's photographs in the newspaper and television.
At the hearing on this motion, Beth Woessner, who had identified the defendant as one of the perpetrators at the lineup, testified that she, her father, and several other persons who had been robbed went to an identification procedure. After arriving there, everyone was placed in a waiting room and then groups of about 7 were taken to another room to view the line-up. After observing the persons in the line-up she was positive that the defendant was one of those persons and one of the perpetrators. Prior to the line-up she had noticed the pictures of the defendant and his accomplice on television when she had walked into a room in which her father was watching television and she immediately recognized them as the persons who robbed her. However, she did not hear the broadcast.
After her group left the room where they had reviewed the line-up, a lady from her group removed from her purse a newspaper clipping of an article, in which the photographs of the defendant and his accomplice were published. Beth was allowed to see the article. There was also a newspaper in the waiting room. However, Beth had no idea whether it contained the article concerning the defendant or not. In any event, Beth stated that no one looked at anything before the identification in accordance with the instructions given the group.
Paul Woessner, Beth's father, testified that prior to the line-up he read the newspaper article concerning the defendant. He also saw the television report in which the pictures of the defendant and his accomplice were placed as suspects or perpetrators. However, he stated that he did not remember the contents of the broadcast. Before viewing the line-up, he waited with several persons in a waiting room for 30 to 45 minutes. At that time it was discovered that most of the victims had telephoned the police after seeing the article and identifying the suspects as the perpetrators of the armed robberies and that there were other discussions among the witnesses concerning the items taken in the robberies. He stated, however, that he did not observe any newspapers in the waiting room and he did not remember a lady in their group who had newspaper clippings with her.
Another witness/victim, Walter Parr, testified that, prior to the line-up, he saw the article in the newspaper which he clipped out and that, at the line-up, according to his observation, it did not appear that anyone had brought the article with them. Also, he said that he and his wife did not speak to other witnesses about this matter.
Elizabeth Parr, who positively identified defendant at the line-up, testified that she saw the newspaper article but not the television report. She did not recall anybody discussing the article or the T.V. report. She also stated that she saw and observed the perpetrators at night on her carport.
A defendant who seeks to suppress an identification must prove that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Lowenfield, 495 So.2d 1245 (La. 1985); cert. denied, Lowenfield v. Louisiana, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986); State v. Smith, 520 So.2d 1305 (La.App. 5 Cir.1988).
Here, we find that a fair evaluation of all of the facts and circumstances above reveal that the defendant failed to show that the identification or the identification procedure was tainted by the publication *1358 and/or the broadcast of the photographs. The witnesses did not indicate that the media coverage focused their attention specifically on the defendant in the line-up. None stated that they identified the defendants in the line-up as the person whose photo appeared in the news or that their attention was focused on the photographed defendants. Moreover, no one was allowed to see the news article prior to the line-up. We find no testimony or evidence establishing that the viewing of the photographs or the T.V. program or the newspaper article influenced any of the witnesses at the identification procedure (the line-up) in their respective identifications of the defendant. Although the photographs were seen by some of the victims prior to the line-up, the viewing of television news coverage of a defendant or seeing his picture in a newspaper is not an element of "identification procedure." State v. Daughtery, 563 So.2d 1171 (La.App. 1 Cir.1990), writ denied, 569 So.2d 980 (La.1990). There is no indication, and certainly no proof, in the present case that the media coverage tainted the out-of-court identification.
This contention is without merit.

ABANDONMENT OF PROSECUTION
Defendant contends that the State abandoned prosecution of all but six counts of the original 15 counts of armed robbery by stating on the record in a pre-trial motion that only six counts would proceed to trial, and, also, by defacing the bill of information with checkmarks to reflect the counts with which the State was proceeding. Therefore, defendant asserts that his plea of guilty to ten counts was fundamentally flawed. However, notwithstanding these assertions, we note that when the plea was entered, the State asserted that the five remaining counts were to be "left open for trial at a later date if necessary."
The district attorney has entire charge and control of every criminal prosecution instituted or pending in his district and determines whom, when and how he shall prosecute. LSA-C.Cr.P. art. 61; State v. Perez, 464 So.2d 737 (La.1985). After charging the defendant with fifteen counts of armed robbery the district attorney elected to proceed to trial on only six of the charges. That, in and of itself, does not evidence an intent to abandon the remaining charges since the district attorney determines when and how he prosecutes.
The charges in question were never dismissed and there is no statutory authority for an abandonment. The primary protection against stale criminal charges are statutes of limitation. State v. Cole, 384 So.2d 374 (La.1980), cert. denied, Cole v. Louisiana, 449 U.S. 1076, 101 S.Ct. 855, 66 L.Ed.2d 799 (1981); and here it is not alleged that the statute of limitations under LSA-C.Cr.P. art. 572 has expired.
In addition, we are convinced by the following colloquy in the record at the hearing at which the plea and sentence were entered that the State clearly evidenced its intent to prosecute all the charges if it desired to, including the charges to which defendant did not plead:
BY THE COURT:
Q. And before I begin, these pleas are acceptable to the State?
MR. ALTERMAN:
To these ten counts, Your Honor, with the understanding counts number five, six, eleven, fourteen and fifteen of the bill of information are left open for trial at a later date if necessary.
THE COURT:
And the plea is acceptable under the Crosby plea?
MR. ALTERMAN:
Yes, Your Honor.
MR. REGAN:
And that's my understanding. And they're being held open contingent on our appeal to the Fifth Circuit. There will be no further prosecutions by the District Attorney's Office until the appeal is completed to the Fifth Circuit.
Accordingly, we find that this contention is also without merit.

*1359 PATENT ERROR
We have reviewed the record for errors patent in accordance with the guidelines stated in State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Schneider, 542 So.2d 620 (La.App. 5 Cir.1989), and find none.
For the foregoing reasons the conviction and sentence are affirmed.
AFFIRMED.