681 So.2d 980 (1996)
STATE of Louisiana,
v.
Donald K. SMITH.
No. 95 KA 1826.
Court of Appeal of Louisiana, First Circuit.
September 27, 1996.
*984 Brent Stockstill, Assistant District Attorney, Baton Rouge, for State of Louisiana.
James P. Manasseh and James Wood, Baton Rouge, for Defendant-Appellant.
Before SHORTESS and LeBLANC, JJ., and TANNER[1], J. Pro Tem.
SHORTESS, Judge.
Donald K. Smith (defendant) was charged by bill of information with armed robbery, La. R.S. 14:64.[2] He pled not guilty and, after trial by jury, was convicted as charged. Subsequently, the State filed a petition charging him as a second felony habitual offender. See La. R.S. 15:529.1. After a hearing, the court found defendant to be a second felony habitual offender and sentenced him to serve a term of forty-nine years and six months imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence and with credit for time served. Defendant has appealed, urging 12 assignments of error. Assignments 10 and 11 are briefed in defendant's separate appeal (95 KA 1827) of his adjudication and sentencing as a habitual offender.

FACTS
At about 1:00 p.m. on April 4, 1993, two men went to Wilson's Jewelers in the Cortana Mall in Baton Rouge. The taller of the two men hit one of the glass cases with a mallet. He then scooped up almost $400,000 worth of diamond solitaire rings. The other man brandished a gun and ordered everyone to get on the floor. After taking the jewelry, the two men quickly left the store. Gwen Arceneaux (listed on the bill of information as the victim) was working near the broken case. Arceneaux, other store employees, and a shopper identified defendant as the gunman.
After the robbery, Jason Bassett, an Army sergeant who had been shopping in the store, ran after the two men. When Bassett exited the mall, he saw a black Oldsmobile Cutlass driving very fast in the opposing lane of traffic. Maintaining eye contact with the vehicle, Bassett ran after it in the parking lot. Eventually, Bassett got into a truck driven by Thomas Eskola, a mall security guard. Eskola and Bassett then pursued the vehicle until it stopped in an area located near the mall. Eskola and Bassett found the black car empty with both doors open. When Bassett got out of the truck, the man who had earlier scooped up the jewelry fired two shots in his direction. The other suspect (identified by Bassett and Eskola as the defendant) disappeared around the building. After the shots, Eskola called for backup. Bassett and Eskola then noticed a gray Oldsmobile traveling away from the scene. Bassett *985 and Eskola were not able to pursue the suspects any further.
Michael Bolden, an off-duty mall security guard who had followed Eskola during the pursuit, heard the first shot and saw the shooter when the second shot was fired. After the shooting, a gray vehicle with an Oklahoma license plate pulled out from behind a business and passed right by Bolden's car. Suspicious, Bolden decided to follow the vehicle. Initially he saw only the driver in the car, but once the car got onto the highway, Bolden noticed another person rise up in the car. Bolden followed the gray car until it stopped on a dead-end street in a residential area. When Bolden drove by the car, he did not see anybody in it. However, a few seconds later, two men got out of the car and ran through the backyard of a residence. Bolden then notified the police. Bolden identified defendant as the man who was driving the gray car.
Baton Rouge City Police Officer Ricky Arnette overheard information about the location of the suspects on the radio. He went to an apartment complex near the dead-end street and observed two men running across a field. He followed their footprints and requested assistance from a canine officer. At about 2:30, the dog used by the canine officer located two men in a van, and the suspects were arrested. Defendant was one of the men; the other was Clenard Johnson. Arnette found a business card from the jewelry store in defendant's pocket. In the physical lineup, witnesses identified Johnson as being the man who scooped up the jewelry. Johnson assisted the police in recovering the jewelry from a backyard.
During the subsequent investigation, police learned the black car had been stolen earlier that day from a Baton Rouge residence. From inside the black car, personnel at the crime laboratory recovered clothing, a hat, and sunglasses which were identified by various witnesses as similar to those worn by the gunman. Inside the gray car, the police found two photographs of defendant and a paper bag on which directions to the mall were written. The gray car was owned by defendant's mother. At the crime laboratory, personnel found a semi-automatic pistol in the gray car. Eyewitnesses identified the pistol as similar to the gun used by defendant during the robbery. Prints lifted from a screwdriver found in the black car and prints taken from the black vehicle were matched to Johnson. None of the prints lifted from either vehicle were matched to defendant.

DENIAL OF MOTION TO SUPPRESS IDENTIFICATION
Defendant argues the court erred when it denied the motion to suppress the identification. He claims the physical lineup was unreliable and suggestive because the witnesses, including those witnesses who had not been able to make a selection upon viewing a photographic display, participated in the lineup after viewing television coverage of defendant's arrest. He also maintains the lineup was suggestive because his apparel focused attention upon him and the officers told the witnesses the suspect would be included in the lineup.
A defendant attempting to suppress an identification must prove the identification was suggestive and there was a likelihood of misidentification as a result of the identification procedure. Even should the identification be considered suggestive, that alone does not indicate a violation of the defendant's right to due process. It is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. A trial court's determination of the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Thomas, 589 So.2d 555, 563 (La.App. 1st Cir.1991). In determining if the court's ruling on the motion to suppress identification was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence presented at the trial of the case. Thomas, 589 So.2d at 563 n. 1.
On the evening of the robbery, Thomas Eskola and Michael Bolden, the two security guards who pursued the robbers, and Jason Bassett, the store patron who assisted the guards in the pursuit, were asked to view photographic displays of the two suspects. *986 Only Bassett was able to make selections from the displays. Neither of the security guards were able to make a selection after viewing the photographs. However, they were able to identify defendant and Johnson in the physical lineups. Eskola explained it was easier to make an identification during the physical lineups because he was able to view the entire suspect, and not just facial features.
The physical lineup for defendant was held four days after the robbery. Of the seven witnesses who viewed the lineup, six identified defendant as the gunman and the other witness made no identification. Each of these seven witnesses admitted they had viewed from one to three television news reports of defendant's arrest. Four of these witnesses testified at the hearing held on the motion, and they indicated the television coverage had no effect on their ability to identify defendant at the lineup. At the trial, the six witnesses who identified defendant at the lineup and a witness who had not participated in the lineup (Jason Bassett) identified defendant as the gunman and indicated they had no doubt concerning the identification. The photograph of the six men who stood in the lineup shows defendant stood in the second position. He wore an orange prison uniform as did the other men, who were selected by defendant and his attorney.
Defendant's main complaint is that the witnesses identified him after viewing his arrest on television. To rebut this claim, at the trial the State introduced a tape of the news coverage which ran on one of the television stations. In the film, defendant and Johnson are seen coming out of the van. Because of the distance, their facial features are not apparent. Later in the newscast, a close-up view of defendant briefly shows the side of his face.
The viewing of television news coverage of a defendant's arrest is not an "identification procedure." State v. Daughtery, 563 So.2d 1171, 1173-74 (La.App. 1st Cir.), writ denied, 569 So.2d 980 (La.1990). The witnesses said the television coverage did not influence their selection at the lineup, and there is no indication the media coverage tainted the out-of-court identifications. See State v. Barnes, 592 So.2d 1352, 1357-58 (La.App. 5th Cir.1991). Thus, the court did not err when it rejected this argument.
We also find no indication attention was focused upon defendant in the lineup because of the clothing he wore or for any other reason. Defendant apparently has confused the clothing he wore in the lineup with the clothing he wore in the picture which was included in the photographic display. In the motion to suppress and in connection with this assignment of error, defendant attacks only the physical lineup. We also reject defendant's claim the witnesses were influenced by comments made by the officers prior to the lineup. One of the witnesses who participated in the lineups testified an officer told him one of the robbers would be in each lineup. However, it is apparent from the testimony of the other witnesses that they merely assumed a suspect would be in each lineup. Even if the officers told the witnesses a suspect would be in each lineup, such a statement does not, in itself, constitute suggestiveness as it is assumed that, when a person is asked to view a lineup, a suspect will be included. See State v. Knight, 323 So.2d 765, 768 (La.1975).
Even assuming, arguendo, that the physical lineup was suggestive, defendant has failed to prove a likelihood of misidentification. The following factors are considered in determining if a physical lineup is reliable: (1) the witness' opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness' certainty displayed at the time of the identification; and (5) the length of time elapsed between the crime and the identification. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); Thomas, 589 So.2d at 564.
Applying this analysis to the facts of this case, we find the identifications of defendant in the physical lineups four days after the offense were reliable. The witnesses had an opportunity to view defendant during the commission of the robbery from distances of *987 six to thirty feet. The lighting was bright, and some of the witnesses looked directly at defendant as he pointed the gun at them. Some gave detailed descriptions of the gunman's physical appearance and clothing. At the trial, five eyewitnesses positively identified defendant as being the gunman, and two security guards identified him as one of the men they pursued. A review of the overall circumstances indicates the identifications were reliable; therefore, the trial court correctly denied the motion to suppress the identifications.
Accordingly, the assignment of error is meritless.

ADMISSION OF OTHER CRIMES EVIDENCE
Defendant contends the court erred when it admitted evidence the black Oldsmobile Cutlass was a stolen vehicle. Defendant maintains such evidence was inadmissible "other crimes" evidence.
Article 404(B)(1) of the Louisiana Code of Evidence authorizes the admission of evidence of other crimes, wrongs, or acts when the evidence "relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." In State v. Brewington, 601 So.2d 656 (La.1992) (per curiam), the Louisiana Supreme Court indicated its approval of the admission of other crimes evidence (under this portion of article 404(B)(1)) "when it is related and intertwined with the charged offense to such an extent that the State could not have accurately presented its case without reference to it." 601 So.2d at 657. See also State v. Fontenot, 618 So.2d 915, 918-19 (La.App. 1st Cir.), writ denied, 623 So.2d 1332 (La.1993).
The black car was the vehicle used by the robbers when they left the mall. Rather than being used to depict defendant as a bad person, evidence the vehicle was stolen was relevant to show the robbers attempted to conceal their involvement in the offense by using a vehicle which could not be traced to them. Additionally, evidence the vehicle had been stolen corroborated the testimony of the owner that items found in the vehicle (in particular hats and sunglasses identified by eyewitnesses as worn by the suspects) did not belong to her and were not placed into the vehicle with her consent. The assignment of error is without merit.

ADMISSION OF VIDEOTAPE OF CRIME SCENE
Defendant claims the court erred when it admitted a videotape of a reenactment of the route traveled when the security guards pursued the suspects. Defendant argues the reenactment of the chase was sufficiently dissimilar to the actual incident that the probative value of the evidence was far outweighed by the prejudicial effect.
The videotape was prepared by an investigator from the district attorney's office with the assistance of Jason Bassett, the customer who assisted the security guards in the pursuit of the suspects. Bassett testified the videotape showed the route he took, both when he was running after the suspects and after he got into the security vehicle. He indicated he had viewed the tape and it fairly and accurately represented the pursuit route. He also said the number of cars shown in the tape was comparable to the number in the parking lot on the date of the offense.
The probative value of an experiment or reconstructed evidence depends in large measure upon the extent to which the reconstructed scene was identical with or similar to that which existed at the time of the incident. State v. Boyer, 406 So.2d 143, 149 (La.1981). While a recreation need not be exact in every detail, the important elements of the test must be identical or very similar to the scene in order to have probative value. State v. Trahan, 576 So.2d 1, 7 (La.1990) (order granting certiorari recalled on rehearing).
Defendant claims the videotape of the reenactment should not have been admitted because the traffic conditions, weather, and number of cars in the parking lot were dissimilar to those conditions present when the offense occurred. After viewing the tape, we find the important element of the reenactment (i.e., the route taken) is very similar to the actual route traveled. We agree with the trial court that the videotape is merely an illustration of the route traveled, similar to *988 charting the route on a map. As such, it was not necessary for it to be an exact reproduction of the events. Although defendant claims the videotape was prejudicial, we disagree. This assignment of error lacks merit.

ADMISSION OF TELEVISION FILM OF DEFENDANT'S ARREST
Defendant argues the court erred when it admitted a videotape of his arrest which had appeared on television. He contends the tape was not adequately identified, and he asserts the tape's probative value was outweighed by its prejudicial impact.
During the redirect examination of Gwen Arceneaux, the State introduced a videotape of a television news report of defendant's arrest. Upon initially viewing the tape, Arceneaux said she did not remember a lot of what she saw on the tape but she "guess[ed]" it was the broadcast she had seen. After viewing the tape again, Arceneaux said the tape showed the news coverage she saw on television. Over defendant's objection, the tape was shown to the jury.
A proper foundation for admission into evidence of a videotape of a television broadcast is laid when a witness having knowledge of the broadcast identifies it as being a tape of the broadcast. See La.Code Evid. art. 901(A). Although Arceneaux initially was uncertain, after viewing the tape a second time she identified it as being the television news broadcast. Additionally, later in the trial the assistant news director for the television station testified she had viewed the tape and had confirmed the tape showed the newscast her station aired twice in connection with this crime. She indicated the video of the apprehension of the suspects was an exclusive video for her station. Thus, any deficiency in the foundation initially laid with the testimony of Arceneaux was cured by the testimony of the assistant news director.
Defendant also argues the prejudicial effect of the tape outweighed any probative value. Article 403 of the Code of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
Defendant claims the tape prejudiced the jurors just as it prejudiced the witnesses who identified defendant in the physical lineup after having viewed the news stories on television. According to comments made by the court, the sound was not played when the tape was shown. The tape shows police officers running toward the van with weapons drawn and two men coming out of the van. Because of the distance, the identity of the suspects is not apparent from that portion of the tape. Later, the tape shows at some length close-up views of Johnson. A close-up view of defendant's head, taken from the side, is shown briefly.
The clear focus of the defense cross-examination of Arceneaux was an attempt to show Arceneaux was able to identify defendant because she saw him on television. The questioning emphasized she had viewed defendant on television for a longer period of time and under calmer conditions than during the robbery. The probative value of the tape was to refute the defense claim that Arceneaux's identification of defendant in the lineup had been influenced by what she viewed on television. After viewing the tape, we find the probative value substantially outweighed any danger of unfair prejudice. Accordingly, we find no merit in this assignment.

ADMISSION OF EVIDENCE SEIZED FROM CLENARD JOHNSON
Defendant argues the court erred when it admitted evidence pertaining to Clenard Johnson. During the trial, defendant objected to the introduction of a variety of evidence relating to Clenard Johnson: an eyewitness description of Johnson, Johnson's photographic display, clothing and a hat identified as worn by Johnson, photographs of Johnson's injuries, Johnson's fingerprint card, and expert evidence that prints lifted from one of the cars matched Johnson's prints.
Defendant claims this evidence was not admissible as the State did not charge him as a principal. However, there is no requirement that an indictment or information *989 explicitly denominate an accused as being a "principal." State v. Muntz, 534 So.2d 1317, 1319 (La.App. 4th Cir.1988).
Defendant also claims the evidence was prejudicial and misleading to the jury. However, we find no indication that evidence proving Johnson's involvement in the robbery would either mislead the jury or unfairly prejudice defendant. The jury was aware there were two robbers, and proof Johnson was the other robber did not prejudice defendant. See State v. O'Banion, 570 So.2d 556, 558 (La.App. 4th Cir.1990).
For these reasons, we find no merit in this assignment.

DENIAL OF MOTION TO SUPPRESS ITEMS SEIZED FROM VEHICLES
Defendant argues the court erred when it denied his motion to suppress evidence seized from the vehicles while they were at the crime laboratory. He maintains the searches were not justified by any of the exceptions to the warrant requirement.
When tangible objects are sought to be excluded from evidence on the basis of an unconstitutional search or seizure, the defendant must timely file a motion to suppress such evidence. Otherwise, he is deemed to have waived any objection to its admission based on an infirmity in the search and seizure. State v. Quimby, 419 So.2d 951, 959 (La.1982). The motion to suppress is a pretrial motion which should be filed in accordance with the requirements of article 521 of the Louisiana Code of Criminal Procedure "unless opportunity therefor did not exist or neither the defendant nor his counsel was aware of the existence of the evidence or the ground of the motion, or unless the failure to file the motion was otherwise excusable." La.C.Cr.P. art. 703(C). The trial court has discretion to permit the filing of a motion to suppress at any time before or during the trial. La.C.Cr.P. art. 703(C).
Defendant did not file a pretrial motion to suppress evidence seized from the vehicles. During the testimony of the expert who processed the cars, defendant orally moved to suppress evidence seized from the gray vehicle on the ground the search was conducted without a warrant and was not a valid inventory search. On appeal, defendant asserts evidence seized from both vehicles should have been suppressed. However, at the trial his motion to suppress applied to the gray car only. He waived any objection he might have had to the admission of evidence seized from the black car.
In denying the motion to suppress evidence seized from the gray car, the trial court concluded the motion should have been filed prior to trial. The court noted that in discovery defendant had been given copies of crime lab reports which listed the evidence seized from the vehicles. The record also indicates one of defendant's attorneys was present during Johnson's trial and heard the testimony of the expert. Under these circumstances, the court did not abuse its discretion when it found defendant's failure to timely file the motion to suppress was inexcusable. See State v. Wilkerson, 448 So.2d 1355, 1362-63 (La.App. 2d Cir.), writ denied, 450 So.2d 361 (La.1984).
Moreover, we notice defendant's questioning of an earlier witness revealed he was aware an inventory search had not been conducted, and he did not object earlier in the trial when some items seized from the gray car (bag with directions to the mall and photographs of defendant) were introduced. Furthermore, even if defendant had filed a timely motion to suppress, there would have been no merit to the motion. An abandoned automobile may be legally searched without a warrant. State v. Kelly, 576 So.2d 111, 117 (La.App. 2d Cir.), writ denied, 580 So.2d 666 (La.1991). The black car was a stolen vehicle, and it was abandoned with the doors open at the scene of the shoot-out. Although the doors to the gray car were locked, defendant abandoned that car (owned by his mother) on a dead-end street while he fled on foot. He testified at trial that, when he left the car, it was not important to him whether he took the keys with him. Thus, he had no reasonable expectation of privacy in either vehicle, and as a consequence the vehicles could be searched without a warrant. See State v. Parker, 421 So.2d 834, 842 (La.1982), cert. denied, 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983).
*990 Accordingly, we find no merit in this assignment of error.

RESTRICTIONS ON TESTIMONY OF TORSHA MILES
Defendant asserts the court erred when it refused to allow the defense to question Torsha Miles (defendant's girlfriend) about the theory that Mitchie Sharp was the gunman during the robbery. He claims the court's ruling violated his right to present a defense.
Defendant, Miles, Johnson, and Johnson's girlfriend drove from Oklahoma to Louisiana and stayed in the same hotel room. Miles testified she and her friends knew Mitchie Sharp. Sharp was Johnson's cousin and was from Oklahoma. On the morning of the robbery, Sharp knocked on the hotel room door, and Sharp and Johnson left the hotel. Miles said she did not know Sharp was in Louisiana until he knocked on the door. According to her testimony, defendant remained at the hotel until about 12:30 p.m. when Johnson called. After talking to Johnson, defendant left the hotel. On cross-examination, the State asked Miles if Sharp was "here," apparently asking if Sharp was present for the trial. Miles said he was not.
On redirect, the defense asked Miles where Sharp was. The State objected and argued the witness had not demonstrated familiarity with Sharp's status. During the State's objection, Miles testified Sharp was in jail at the time of the trial for several jewelry store robberies. The court sustained the State's objection, and the State did not ask the court to admonish the jury to disregard the testimony. When defendant argued the State had opened the door to the testimony by asking Miles if Sharp had come for the trial, the court explained the testimony was inadmissible as hearsay. Although defense counsel claimed the witness knew where Sharp was, he did not proffer the source of her information. Counsel also said Sharp was "doing time for a whole series of jewelry robberies that follows exactly the same m.o. that's shown in this one here."
Defendant does not contest the trial court's determination that Miles' testimony concerning Sharp's location was hearsay. The court assumed someone told Miles Sharp was in jail, and no evidence to the contrary was introduced. Thus, the court properly found the testimony inadmissible as hearsay. See La.Code Evid. arts. 801 and 802. While hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant's constitutional right to present a defense, it should be admitted. State v. Gremillion, 542 So.2d 1074, 1078 (La.1989). Defendant provided very little information concerning the substance of the evidence, and there is no indication testimony by Miles concerning Sharp's location would have been reliable and trustworthy. See La.Code Evid. art. 103(A)(2). Furthermore, defense counsel claimed local law enforcement officers and the F.B.I. were familiar with Sharp's location. Nothing in the court's ruling prevented defendant from calling the appropriate law enforcement or correctional officials to establish Sharp's location. Accordingly, the court's ruling did not interfere with defendant's right to present a defense. Moreover, the defense succeeded in presenting Miles's testimony regarding Sharp's whereabouts to the jury, despite the court's ruling. After Miles testified Sharp was in jail for several jewelry store robberies, the State failed to ask the court to instruct the jury to disregard that testimony.
For these reasons, there is no merit in this assignment.

DENIAL OF MOTION FOR NEW TRIALBRADY VIOLATION
Defendant contends the court should have granted a new trial on the ground the State failed to disclose exculpatory evidence. On appeal, defendant limits his discussion to the State's alleged failure to disclose that one of the eyewitnesses told the prosecutor before trial that defendant was not the gunman.
Prior to trial, defendant filed a motion for Brady material and a motion for discovery and inspection in which he generally sought exculpatory or impeaching evidence. In response, the State said one of the witnesses at the physical lineup had failed to make an identification during defendant's lineup. In defendant's second motion for Brady material, defendant said his investigation had revealed a "number" of eyewitnesses had been *991 unable to identify him, and he specifically asked for the names and addresses of any witnesses who had been unable to identify defendant. The State did not respond to this motion.
After the State rested, defendant moved for a mistrial, arguing a Brady violation had occurred. Defendant said the State's evidence revealed the two security guards who pursued the suspects had viewed the photographic displays but had not been able to make an identification and another witness (who saw the suspects running in the mall) was not able to make an identification. Because the State had not provided defendant with this information before trial, he was concerned there might be other witnesses who were unable to identify defendant whose identities had not been disclosed to the defense. The court denied the motion for mistrial. Defendant then specifically asked if Reverend Bennie Veals and members of the Veals family had been unable or unwilling to identify defendant as one of the perpetrators. Rephrasing the defense inquiry, the court asked the State if it had any exculpatory evidence, and the prosecutor said he did not.
Following the conviction, defendant filed a motion for new trial, alleging a Brady violation as one of the grounds. At the evidentiary hearing held on the motion, Reverend Veals testified he, his wife, and his daughter were in the jewelry store when the robbery occurred. According to Veals, when the police interviewed him after the robbery he told them the gunman was "about 5-8, 5-11." Veals also recalled being asked by the police after the robbery to participate in a lineup. He said he told the officer he did not want to participate in the lineup because he did not think he could select the suspect from a lineup. In advance of the trial, Veals and his family met with an assistant district attorney (A.D.A.) and viewed a tape of defendant's arrest. Veals claimed that, after watching the tape twice, he told the A.D.A. the man arrested was not the gunman. Veals remembered the gunman as being taller than defendant. When asked to view defendant in court, Veals said defendant was not the person he saw with a gun during the robbery. Veals said he was subpoenaed for trial by the State but was never called to testify. Veals admitted he met with defendant's family's minister in advance of the trial and met with defendant after the conviction. Veals also admitted he saw the tape of the arrest on television. He said he assumed the police arrested the two men who committed the robbery. Veals' wife also testified at the hearing. She also claimed her husband told the A.D.A. the man on the tape was not the gunman.
To rebut this testimony, the A.D.A. testified that, during the meeting he had with the Veals family, they watched the tape recording and eliminated Johnson as the gunman but were reluctant to identify defendant as a participant. According to the A.D.A., Veals told him he believed defendant was the gunman but was not certain and, thus, did not want to swear to the identification under oath. The A.D.A. denied ever being told by Veals that defendant was not the gunman. Two secretaries who happened to be in the same room where the Veals viewed the tape partially corroborated the testimony of the A.D.A.
A police officer who interviewed Veals after the offense testified at the hearing that Veals described the gunman as short. He also testified that, when he asked Veals to come to the physical lineup, Veals refused and explained he did not think it would be fair to come to the lineup because he had viewed the broadcast of defendant's arrest and recognized the man arrested as the gunman. An investigator with the district attorney's office also testified at the hearing. He said when he delivered the subpoenas to the Veals family he asked them for a description of the gunman and was told the gunman was short. The investigator also recalled Veals telling him the shorter of the two suspects seen on television was the man who held the gun.
The suppression of evidence favorable to an accused by the prosecution violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). See also Kyles v. Whitley, *992 ___ U.S. ___, ___, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). Evidence favorable to an accused includes exculpatory evidence as well as evidence which can be used to impeach prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Regardless of the type of request made by the defense (specific request, general request, or no request), favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682 and 685, 105 S.Ct. at 3383 and 3385. See also State v. Marshall, 94-0461, p. 13 (La.9/5/95), 660 So.2d 819, 825. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
In reviewing materiality, this court must provide a cumulative evaluation of the suppressed evidence, keeping in mind the defendant does not have to show that, with the addition of the undisclosed evidence, his trial would have resulted in acquittal or that there would be an insufficiency of the evidence to support a conviction. The defendant need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." Marshall, 94-0461 at p. 17, 660 So.2d at 826 (quoting Kyles v. Whitley, ___ U.S. at ___, 115 S.Ct. at 1569). Once a reviewing court applying Bagley has found constitutional error, the error cannot subsequently be found harmless. Kyles v. Whitley, ___ U.S. at ___, 115 S.Ct. at 1566.
Under some circumstances the fact a witness is unable to identify the perpetrator may constitute Brady material. See State v. Lindsey, 28,016, p. 5 (La.App.2d Cir. 4/3/96), 671 So.2d 1155, 1159. As we indicated in State v. Vampran, 491 So.2d 1356, 1362 (La. App. 1st Cir.), writ denied, 496 So.2d 347 (La.1986), if a witness who had an opportunity to observe the incident is unable to identify or misidentifies the accused as the perpetrator, such information, in some situations, tends to exculpate the defendant.
Defendant's defense was that he did not participate in the planning of the robbery and it was Sharp who was the gunman during the robbery. Thus, a primary issue for the jury was the credibility of the eyewitness identification. It is apparent from the court's ruling that it rejected the testimony of Veals and concluded Veals did not tell the State defendant was not the gunman. Thus, the only exculpatory evidence the State arguably failed to disclose was the inability of the Veals family (and possibly other witnesses) to identify the suspect. Under the circumstances of this case, the fact some of the eyewitnesses were unable to identify defendant did not constitute material evidence because confidence in the outcome of the trial was not undermined. Several witnesses identified defendant as the gunman, and security guards followed defendant to an area near where he eventually was found hiding in a van. Barbara Pitcher, a store employee, testified she identified Johnson during his lineup but was unable to positively identify defendant during his lineup. Angela Stevens, a mall patron who observed the suspects running in the mall, testified she was not able to identify the men. It is not reasonably probable the result of the proceeding would have been different had evidence that other witnesses also were not able to identify the gunman been disclosed to the defense.
Moreover, during the trial, defense counsel's comments indicated he was aware some witnesses had expressed an inability to identify the perpetrators. On appeal defendant has not argued error occurred by the State's failure to tell him if any of the witnesses failed to identify a suspect during the physical lineup or photographic display or if any of the witnesses expressed the inability to identify the suspects. Accordingly, defendant is not entitled to a new trial on the basis of a Brady violation. See Marshall, 94-0461 at p. 18-19, 660 So.2d at 827 (fact state failed to disclose the victim of a robbery and attempted first degree murder identified someone other than defendant as the shooter was not material evidence and, thus, did not require a new trial).
*993 We find no merit in this assignment of error.

INSUFFICIENT EVIDENCE
Defendant maintains the court erred when it denied the motion for new trial which was filed on the ground the verdict was contrary to the law and evidence. In his brief, defendant argues the State failed to prove the identity of the gunman.
Defendant did not properly present this issue before the trial court. The proper procedural vehicle for raising the insufficiency of the evidence is by first filing a motion for post-verdict judgment of acquittal before the trial court. La.C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error. State v. Leagea, 554 So.2d 833, 835 (La.App. 1st Cir.1989).
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. State v. Pittman, 93-0892, p. 5 (La.App. 1st Cir. 4/8/94), 636 So.2d 299, 302. Where the key issue is a defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. Positive identification by only one witness may be sufficient to support a conviction. State v. Andrews, 94-0842, p. 7 (La. App. 1st Cir. 5/5/95), 655 So.2d 448, 453.
During the trial, four of the jewelry store employees who witnessed the offense and Bassett (the customer who witnessed the offense and pursued the suspects) confidently identified defendant as the man who threatened them with a gun during the robbery. Four days after the robbery, these four employees viewed a physical lineup and identified defendant as the gunman, and on the evening of the robbery Bassett selected defendant's picture in a photographic display. Eskola (the security guard who, along with Bassett, pursued the black car) identified defendant in court and in the lineup as the man he saw standing by a building after the shots were fired. Bolden (the off-duty security guard who followed the gray vehicle) identified defendant in court and in the lineup as the driver of the black car. The officer who chased the suspects across a field and the canine officer whose dog located the suspects identified defendant as one of the two men found in the van.
In addition to these identifications, the State introduced substantial circumstantial evidence which corroborated the identifications. When defendant was arrested, he had a business card from the jewelry store in his pocket. Clothes and a hat similar to those worn by the gunman were found in the black car, and a gun similar to the one used during the robbery was found in the gray car. Defendant had a close connection to Johnson, and Johnson's prints were found in the black car and on a screwdriver recovered from the black car. Additionally, Johnson helped the police recover the jewelry. This evidence and the identifications of the witnesses negated any reasonable probability defendant was not properly identified as the assailant.
Testifying in his own behalf, defendant denied planning or participating in the robbery and claimed the business card was not in his pocket. According to the testimony of defendant and Torsha Miles (the mother of defendant's child), defendant, Miles, Johnson, and Johnson's girlfriend traveled to Louisiana from Oklahoma to attend a sporting event. They stayed in the same Baton Rouge hotel room. Miles testified that, early on the morning of the robbery while defendant was sleeping, Mitchie Sharp knocked on the hotel room door. Sharp, Johnson's cousin, also lived in Oklahoma. Defendant and Miles knew Sharp but had not known he was in Louisiana. After Sharp knocked on the door, Johnson left with Sharp. At about 12:30 p.m., Johnson called the room and spoke to defendant. Defendant testified that, after the call, he left the room and drove the gray car to a convenience store where he met Sharp and Johnson. Defendant identified a picture of the black car as the car Sharp and Johnson were in. Defendant *994 said he followed Sharp and Johnson to an office building where they told him to wait. After a short wait, defendant heard cars and gunshots. He then saw Sharp running to the car. He claimed Sharp acted strangely (as if he had been shot). According to defendant, Sharp changed his clothes in the backseat, got out of the car, and ran away. Johnson then got into the car and told defendant to leave. Defendant drove away quickly and followed Johnson's instructions about where to drive. Eventually he stopped the car on a dead-end street. Johnson told him to get out of the car, and they both ran and jumped a fence. Defendant claimed he did not find out about the robbery until later, when he and Johnson were in the van.
The guilty verdict returned in this case indicates the jury believed the testimony of the State's witnesses and rejected the testimony of defendant and Miles. It is well-settled that the trier of fact may accept or reject, in whole or in part, the testimony of any witness. Andrews, 94-0842, p. 3, 655 So.2d at 451. According to defendant's version of the events, he left his mother's car parked unsecured on an unfamiliar street, jumped a fence, and ran through a field without being aware of the robbery. The jury's decision to reject this testimony was rational. Accordingly, we find no merit in this assignment of error.

CUMULATIVE ERROR
Defendant adopts the arguments from the other assignments of error and argues the cumulative error requires the granting of a new trial. We have carefully reviewed each assignment of error briefed by defendant and have found no reversible error. Furthermore, the combined effect of the incidences complained of did not deprive defendant of the right to a fair trial. There is no cumulative prejudicial impact nor is there a denial of due process. See State v. Copeland, 530 So.2d 526, 544-45 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); State v. Linson, 94-0061, p. 8 (La.App. 1st Cir. 4/7/95), 654 So.2d 440, 444-45, writ denied, 95-1120 (La.9/22/95), 660 So.2d 470. This assignment is without merit.
AFFIRMED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The initial bill of information jointly charged defendant and Clenard "Ken" Johnson (docket no. 4-93-434). The court granted defendant's motion to sever, and the State filed new bills of information for each defendant. Previously, this court affirmed Johnson's convictions for armed robbery and two counts of attempted second degree murder. State v. Johnson, 94-1564 (La. App. 1st Cir. 10/6/95), 671 So.2d 461, writ denied, 95-2715 (La.2/16/96), 667 So.2d 1050.