CHARLES R. JONES, Judge.
|2Shawn Simpson appeals his guilty plea and sentence of five years imprisonment, to one count of possession with the intent to distribute marijuana. He contends that the trial court erred by denying his motion to suppress the evidence. We find that Simpson’s claim has merit. Thus, we vacate his plea of guilty, grant his motion to suppress evidence, and remand.
The State of Louisiana charged Shawn Simpson with one count of possession with the intent to distribute marijuana. The court heard and denied his motion to suppress the evidence. Simpson sought writs in this court, which this court denied, noting that he had an adequate remedy on appeal if he was ultimately convicted. State v. Simpson, unpub., 2010-1191 (La. App. 4 Cir. 9/2/10). Simpson withdrew his prior plea of not guilty and pled guilty as charged pursuant to State v. Crosby, 338 So.2d 584 (La.1976), reserving his right to appeal the district court’s denial of his motion to suppress the evidence. Simpson waived all delays, and the court sentenced him to serve five years at hard labor. This timely appeal followed.
laThe only witness at the motion to suppress hearing was Officer Adrian Chapital, who testified that he was working in the Eighth District when he arrested Simpson. He testified that he and his partner were on regular patrol when they saw Simpson in the general area around Bourbon Street. One of the instances when they saw Simpson was on St. Peter Street between Royal and Bourbon Streets. Officer Chapital testified that Simpson “approached a white female and a white male” and asked them a question. The couple *447 walked away, and Simpson followed. Simpson turned onto Bourbon Street, apparently no longer following the couple. Officer Chapital testified that Simpson did this after “he looked like he saw” the officers. Later, Officer Chapital saw Simpson in the 600 block of Royal Street “where he was with another white male.” This time, Officer Chapital and his partner “elected to stop him to find out what was going on.” The officer testified that they decided to stop Simpson because they “thought he was either baiting [sic] or participating in some type of illegal activity”
After Officer Chapital and his partner stopped Simpson, Officer Chapital noticed a “bulge inconsistent with human anatomy in the front waistband of his [Simpson’s] pants.” He conducted a frisk and “felt a hardened object in the waistband.” Officer Chapital removed the object from Simpson’s waistband and discovered that it was a Crown Royal bag. He opened the bag and discovered “a bag of marijuana wrapped tightly in a rectangular shape.” Several small baggies containing marijuana were also inside the Crown Royal bag. The officers also seized $97.00 from Simpson. After Simpson had been arrested, he was transported |4to Central Lockup where the jail authorities discovered additional marijuana and money.
During cross-examination, Officer Cha-pital, who testified that he had been on the police force for three years, admitted that a supervisor required him to write a supplemental police report because neither the “gist” sheet he completed nor the first report he wrote set out any of the observations that allegedly led to the investigatory stop of Simpson. Officer Chapital testified that he wrote in the gist and his first report that he and his partner had only approached Simpson “to conduct a field interview,” and not because he was suspected of begging. The officer further testified that his initial report was approved by his supervisor, but then another supervisor asked him “to clarify further,” and Officer Chapital wrote the final report ten days after Simpson’s arrest.
Officer Chapital’s final report reflected that he and his partner saw Simpson a total of three times, and that each time he was “interacting with different people”. The officer testified that the reason for stopping Simpson was because “he had interacted with several different people around” Bourbon and Royal Streets. None of the information or basis for a stop was included in any official report except the final one written for clarification purposes.
Officer Chapital admitted that the officers had not received any complaints or calls about Simpson, nor did they see Simpson engaged in any activity which appeared to be drug transactions, and they did not see any currency exchanged between Simpson and the persons with whom he interacted. All the officers saw |fiwas Simpson walk up and talk to various people. When asked if Officer Chapital had a hunch that Simpson was engaged in some type of illegal activity, Simpson replied to defense counsel, “[i]f you want to call it that, yes, sir.” The officer acknowledged that he had no “foundation to believe he [Simpson] was doing anything illegal other than” his own belief.
Officer Chapital also testified that he and his partner twice tried to stop Simpson, but were unsuccessful the first time. He testified that the police car was three or four car lengths from the intersection of St. Peter and Bourbon Streets when Simpson “looked back, and he got onto Bourbon Street.” The officers exited the police vehicle to stop Simpson, but they could not find him in the crowd on Bourbon Street. When they were able to *448 stop him later, they walked up to him and said that they needed to talk to him; but that Simpson was not free to leave.
Finally, Officer Chapital admitted during cross-examination that the bulge he saw in Simpson’s waistband was rectangu-larly shaped; it looked like a square, not like a firearm. Nevertheless, Officer Cha-pital testified that he believed the object was a weapon, and for the same reason, once he had retrieved the purple bag from Simpson’s waistband, Officer Chapital opened the bag and found the marijuana.
Finally, after Officer Chapital testified, defense counsel attempted to argue the issues concerning the motion to suppress to the trial court. However, the court refused to allow argument, telling defense counsel to look at the people in the court room. The court told counsel, “Save it when they come up. All right? Court finds | r,probable cause. Motion to suppress is denied. In so many words, save it when you do your jury trial. All right? Now, I need to get those ladies and gentlemen.”
By his sole assignment of error, Simpson contends that the trial court erred by denying his motion to suppress the evidence. Specifically, he argues that the officers did not have reasonable suspicion of criminal activity to stop him. He further argues that the seizure of the Crown Royal bag from his waistband exceeded the scope of a frisk that is authorized during an investigatory stop, and the officer was not justified in opening the bag to examine its contents. This assignment of error has merit.
“A police officer does not need probable cause for arrest or reasonable suspicion for an investigatory stop to approach a citizen in public.” State v. Marzett, 2009-1080, p. 8 (La.App. 4 Cir. 6/9/10), 40 So.3d 1204, 1210. As this Court further noted:
No violation to a person’s liberty or privacy occurs when a police officer attempts to talk to him, as long as that individual is free to disregard the questioning and walk away. Id. [State v. Press, 767 So.2d 56 (La.App. 4 Cir. 2000) ] A person is “seized” for purposes of La. Const. Art. 1, Sec. 5, when he is either ‘actually stopped’ or when an actual stop is ‘imminent.’ State v. Bacuettes [Bacuetes], 2000-1053, p. 5 (La. App. 4 Cir. 10/18/00), 772 So.2d 813, 815, citing State v. Belton, 441 So.2d 1195 (La.1983).
Marzett, 2009-1080, pp. 8-9, 40 So.3d at 1210.
The Louisiana Supreme Court has divided encounters between police and citizens into three “tiers.” State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179. The court described the lowest two tiers of interaction as follows:
In United States v. Watson, 953 F.2d 895, 897 n. 1 (5th Cir.1992), cert. denied, 504 U.S. 928, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992), the court articulated a useful three-tiered analysis of interactions between citizens and police under the Fourth Amendment. At the first tier, mere communications between officers and citizens implicate no Fourth Amendment concerns where there is no coercion or detention. Id.; State v. Britton, 93-1990 (La.1/27/97); 633 So.2d 1208, 1209 (noting that police have the same right as any citizen to approach an individual in public and to engage him in conversation under circumstances that do not signal official detention).
At the second tier, the investigatory stop recognized by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police officer may briefly seize a person if the officer has an objectively reasonable suspicion, supported *449 by specific and articulable facts, that the person is, or is about to be, engaged in criminal conduct or is wanted for past criminal acts. Watson, 953 F.2d at 897 n. 1; United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)(citing Terry, 892 U.S. at 27, 88 S.Ct. 1868); State v. Moreno, 619 So.2d 62, 65 (La.1993). See also La.Code Crim. Proc. art. 215.1(A), which provides that an officer’s reasonable suspicion of crime allows a limited investigation of a person. However, reasonable suspicion is “insufficient to justify custodial interrogation even though the interrogation is investigative.” Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
Fisher, 97-1133, pp. 4-5, 720 So.2d at 1182-1183,
In State v. Hamilton, 2009-2205 (La.5/11/10), 36 So.3d 209, the court held that police officers did not seize the defendant, for constitutional purposes, when they called to him; after initially walking away, the defendant chose to walk back to the officers and removed his hands from his pockets at the officers’ request. As the defendant took his hands out, a foil of cocaine fell to the ground. The court opined that the officers’ “request for the defendant to remove his hands from his pockets was not coupled with any search, pat down, or intrusion into the privacy of the defendant,” and thus, the evidence was “abandoned prior to any lawful |8intrusion into the defendant’s right of freedom from governmental interference” and was lawfully seized. Id., pp. 6-7, 36 So.3d at 213-14. Stated in another way, the contact between the defendant and the police fell within the first tier of interaction described in Fisher.
The second tier of contact, a Terry or investigatory stop, was discussed by the Louisiana Supreme Court in State v. Temple, 2002-1895 (La.9/9/03), 854 So.2d 856:
Although La.C.Cr.P. art. 215.1 permits an officer to stop a citizen in a public place and question him, the right to make such an investigatory stop must be based upon reasonable suspicion that the individual has committed, or is about to commit, an offense. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 899 [889] (1968); State v. Andrishok, 434 So.2d 389, 391 (La.1983). If an officer stops a person pursuant to art. 215.1, the officer may conduct a limited pat down frisk for weapons if he reasonably believes that he is in danger or that the suspect is armed. La. C.Cr.P. art. 215.1(B). Determining whether “reasonable, articulable suspicion” existed requires weighing all of the circumstances known to the police at the time the stop was made. State v. Williams, 421 So.2d 874, 875 (La.1982).
In making a brief investigatory stop on less than probable cause to arrest, the police “‘must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.’ ” State v. Kalie, 96-2650, p. 3 (La.9/19/97), 699 So.2d 879, 881 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). The police must therefore “articulate something more than an “ ‘inchoate and unparticularized suspicion or “hunch.”’” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1883). This level of suspicion, however, need not rise to the probable cause required for a lawful arrest.
In determining whether the police possessed the requisite “‘minimal level of objective justification’ ” for |flan investigatory stop based on reasonable suspicion of criminal activity, Sokolow, 490 *450 U.S. at 7, 109 S.Ct. at 1585 (quoting INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)), reviewing courts “must look at the ‘totality of the circumstances’ of each case,” a process which “allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that ‘might well elude an untrained person.’” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750-51, 151 L.Ed.2d 740 (2002)(quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)); see also State v. Huntley, 97-0965, p. 1 (La.3/13/98), 708 So.2d 1048.
Temple, 2002-1895, pp. 4-5, 854 So.2d at 859-860.
In Temple, the Supreme Court affirmed this Court’s decision holding that police officers lacked reasonable suspicion to stop and frisk the defendant and his companions. The officers were responding to a call of an attempted burglary by four individuals. They observed the defendant and three other people sitting on a porch step of the apartment building. When one of the people observed the police, he quickly leaned against a wall. A second person, a female, sat down, and the defendant sat next to her. The officers saw the defendant hand the female a white object, which she placed in her pocket and then got up and walked away. All four people were detained by the police. A frisk of the female resulted in the seizure of a large quantity of crack cocaine. The Supreme Court stated that reasonable suspicion required more than “looking nervous” and “sitting on a porch step” in an area noted for its “high crime.” Temple, p. 7, 854 So.2d at 861. The court noted that the victim of the alleged burglary did not provide descriptions, and “there was no suspicion that the individuals herein were even involved in that crime or any | mother wrongdoing. We must presume that citizens are law abiding, even those in public housing developments and other targeted high crime areas.” Id. Finally, the court further held that there was no basis for a frisk or search of the suspects.
In the instant case, Officer Chapi-tal’s testimony was very brief as to the nature of the initial contact between Simpson and the officers. The officer testified that he and his partner “elected to stop” Simpson and that “upon stopping him ... I immediately noticed a bulge....” The officer did not provide any details of how the stop was accomplished, whether they merely asked Simpson to speak to them, or whether they physically took custody of him. However, once Officer Chapital frisked Simpson, the encounter clearly reached the level of an investigatory stop for which reasonable suspicion of criminal activity was necessary. Temple. Also, in order to lawfully frisk Simpson, Officer Chapital must have reasonably believed that he was in danger or that Simpson was armed. La.C.Cr.P. art. 215.1(B); Temple.
Simpson argues that Officer Chapital had no reasonable basis to suspect that he was committing a crime. The only activity to which the officer testified observing was Simpson’s interaction with people in the well-visited area of the French Quarter. Interestingly, the most detailed description offered was that Simpson walked up to a white couple, spoke with them, and briefly followed them as they walked away. As discussed above, it is not considered an invasion of anyone’s right to privacy if a police officer approaches him in a public setting and asks to speak with that person. It is difficult to conclude that it is a crime if a Inprivate citizen similarly seeks to approach a person on a street and asks to *451 talk to them when there is no evidence that the defendant was seeking to engage in a criminal act, such as a drug transaction, with that person, and where the defendant did not prevent the person from choosing to ignore him by walking away.
Officer Chapital admitted that he had no foundation for his suspicion that Simpson was engaged in criminal activity. Further, if he had such a basis, he failed to articulate the facts beyond a generalized hunch. The officer did not articulate any behavior by Simpson which indicated he had committed or was about to commit a crime. The officer did not identify the area as a high crime area known for any narcotics transactions, robberies, or any other crimes. Officer Chapital’s most detailed description of any facts was that Simpson was interacting with white people. The record does not indicate Simpson’s race. However, Officer Chapital did not explain the significance, if any, in the fact that Simpson’s race differed from those of the people with whom he interacted, or how that racial difference, in the officer’s experience, indicated that Simpson was engaging in criminal activity. Also, Officer Cha-pital did not describe Simpson to the court. He did not testify that Simpson appeared homeless, intoxicated, or mentally ill, such that he might have been violating an ordinance against public intoxication or disturbing the peace. From the transcript it is impossible to tell if Simpson was a beggar asking for money or a religious provocateur trying to convince people not to sin on Bourbon Street.
|12There have been innumerable cases addressing the issue of reasonable suspicion. A review of many of those cases shows that the State failed to demonstrate that the police officers had reasonable suspicion in this case because of the lack of indicia of criminal activity.
In State v. Vingle, 2001-0840 (La.App. 4 Cir. 11/21/01), 802 So.2d 887, this Court held that the police lacked a basis for an investigatory stop of a white female driving a new vehicle with a temporary tag during the daytime hours who pulled her car over in front of the house of a known drug dealer. Although one officer later testified that they were investigating an individual who was selling temporary license plates in the neighborhood, he also admitted that many white people drove through the area as a shortcut from the neighboring parish to a nearby commercial area. However, another officer testified that many white people also drove into the area to purchase narcotics. This Court summarized the facts, in its finding that there was an insufficient basis for the investigatory stop, as follows:
[Tjhere was no evidence of evasive conduct on the part of the defendant. She did not appear intoxicated. She was simply driving through a neighborhood in the broad daylight at 10:00 a.m. She pulled over when a police car appeared behind her, was stopped, and ordered out of the car. She did not attempt to flee, and she did not disobey an order to stop. There was no testimony that she made any furtive movements such as trying to hide something under the seat. Before being stopped, she did not appear nervous or give a startled look. At the time of the stop, there was no evidence of a gun and no evidence of paraphernalia. There was no tip from any informant that she was engaged in any suspicious behavior at all. As such, there could be no corroboration. The officers stopped the defendant for two simple reasons: she was a white woman in a black | ^neighborhood, and she was driving a brand new car with temporary plates.
Vingle, 2001-0840, pp. 8-9, 802 So.2d at 892.
*452 In contrast, in State v. Pautard, 485 So.2d 909 (La.1986), the Supreme Court found that an investigatory stop was justified where an experienced police officer saw a vehicle occupied by a white male and a white female parked at a closed service station in an area of Baton Rouge known as a “shooting gallery” or an area of heavy narcotics activity. The officer observed a black male approach the parked vehicle and engage in a conversation with the occupants. Because it was dark, the officer could not see if any specific items were exchanged. However, as the vehicle started to drive away, the occupants saw the police officer. The officer signaled the car to stop, but it did not do so for several blocks. During that time, the officer observed the passenger apparently eating something. A full investigatory stop resulted. In considering whether the initial stop was lawful, the court concluded that it was lawful, in light of the officer’s experience and the defendants’ action even though the officer could never state he actually anything exchanged. See also State v. Wilson, 2000-0178 (La.12/8/00), 775 So.2d 1051, in which the court found that the extensive experience related by the police officer was sufficient to validate the investigatory stop; the officer explained why and how the race of one of the suspects factored into his suspicion that he had seen a drug transaction and also articulated several facts which also entered into his reasoning.
We agree with the court of appeal that “the fact a white man is walking in a predominantly black high crime or drug trafficking area does not constitute reasonable cause to stop him.” [State v.] Wilson, 99-2392 at 7 [ (La.App. 4 Cir. 12/22/99), 759 So.2d 351]. See United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir.1982) (“Race or color alone is not a sufficient basis for making an investigatory stop.”) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 886-87, 95 S.Ct. 2574, 2582-83, 45 L.Ed.2d 607 (1975)). Officer Michael Glasser was therefore not entitled to act solely on the basis of his “extensive experience in purchasing narcotics” in the area of the Iberville Housing Project in New Orleans, “that it’s an unfortunate but a common occurrence that white people will go into the [area] in an effort to try to obtain contraband that they cannot get elsewhere, or feel that they can’t get elsewhere.” However, the officer made clear in his testimony at the suppression hearing that while racial incongruity “did factor in,” he considered other circumstances more important in his decision to make an investigatory stop.
Wilson, 2000-0178, pp. 1-2, 775 So.2d at 1052.
In its response, the State first argues that the officers did not need reasonable suspicion to approach Simpson and ask him questions. However, the officers did more than just approach him; they stopped and frisked him, turning the encounter into an investigatory stop for which they needed reasonable suspicion of criminal activity. The State also points to the fact that Simpson approached several people who attempted to walk away from him, and upon seeing the officers approaching, he fled. However, the officers testified that Simpson turned onto Bourbon Street when he “apparently” saw the police vehicle. The State characterizes the location of the stop as a high crime area, but there was no testimony to support this characterization.
In the instant case, considering the lack of articulated facts which demonstrates that Officer Chapital and his partner reasonably suspected Simpson of criminal activity, the officers lacked a valid basis to conduct an investigatory stop of Simpson.
*453 In State v. Sims, 2002-2208 (La.6/27/03), 851 So.2d 1039, the court discussed that a police officer’s authority to frisk a person stopped pursuant to La. C.Cr.P. art. 215.1(A) is subject to an objective standard on review:
An officer’s right to conduct a protective frisk is codified in La.Code Crim. Proc. art. 215.1(B), which provides that “[wjhen a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon.” While it is true that an officer is never justified in conducting a pat-down for weapons unless the original investigatory stop itself was justified, a lawful detention for questioning does not automatically give the officer authority to conduct a pat-down for weapons. State v. Hunter, 375 So.2d 99, 101 (La.1979). Even after a lawful investigatory stop, a police officer may frisk the suspect only where a reasonably prudent person would be warranted in the belief that his safety or that of others is in danger. La.Code Crim. Proc. art. 215.1(B); Terry, 392 U.S. at 21, 88 S.Ct. at 1880. Therefore, the reasonableness of a frisk is governed by an objective standard. State v. Dumas, 00-0862, pp. 2-3 (La.5/04/01), 786 So.2d 80, 81.
The officer’s suspicion that he is in danger is not reasonable unless the officer can point to particular facts which led him to believe that the individual was armed and dangerous. Hunter, 375 So.2d at 101. The officer need not establish that it was more probable than not that the detained individual was armed and dangerous. Rather, it is sufficient that the officer establish a “substantial possibility” of danger. Id. at 102. In determining the lawfulness of an officer’s frisk of a suspect, courts must give due weight, not to an officer’s “inchoate and unparticularized suspicion or ‘hunch,’ but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.” Terry, 392 U.S. at 21, 88 S.Ct. at 1880.
Sims, 2002-2208, p. 6 (La.6/27/03), 851 So.2d at 1043-44.
Here, the officers lacked the requisite reasonable suspicion to conduct an investigatory stop of the appellant. Thus, Officer Chapital could not lawfully |, (¡subject him to a frisk for weapons under the authority granted by La.C.Cr.P. art. 215.1(B). Moreover, this is apparently not a situation in which Officer Chapital or his partner saw the outline of a handgun in Simpson’s clothing and thus would have had a reasonable belief that he was guilty of carrying a concealed weapon. Officer Chapital merely stated that the bulge in Simpson’s waistband was not consistent with human anatomy. However, choosing to carry property under one’s clothing is not a basis to be stopped and frisked. See State v. Dappemont, 98-0446 (La.App. 4 Cir. 3/17/99), 734 So.2d 736, in which the defendant was standing in a courtyard in a housing project when he saw police officers drive into the courtyard. He immediately walked away with his hand in his waistband. The officers stopped him and ordered him to take his hand out of his waistband. When he did so, the officers saw a piece of paper sticking out of his zipper area. The officers frisked him and discovered a bulge in the area where they saw the paper. They removed the bulge, which was found to be a bag of marijuana. This court found that under these circumstances, the officers did not have reasonable suspicion to stop the defendant. See also State v. Denis, 96-0956 (La.App. 4 Cir. 3/19/97), 691 So.2d 1295.
*454 In its response, the State argues that upon finding the hard object in Simpson’s waistband during the frisk, the officers were justified in believing it was a weapon and seizing it. However, the State had to show that the officers reasonably believed that Simpson was armed before they frisked him; at best, the 117officer testified that he could see a rectangular bulge at Simpson’s waist that he admitted was not shaped like a gun and was inconsistent with human anatomy.
The State failed to show a legitimate basis for the frisk of Simpson.
The final issue that Simpson addresses, is whether Officer Chapital had a legitimate basis to seize and then open the bag seized from Simpson’s waistband. The State does not address this issue in its brief. However, it appears that this search was also improper as it exceeded the scope of the frisk for weapons.
The “plain feel” exception to the warrant requirement was addressed by the Louisiana Supreme Court in State v. Boyer, 2007-0476 (La.10/16/07), 967 So.2d 458:
In Minnesota v. Dickerson, 508 U.S. 366, 371, 113 S.Ct. 2130, 2134, 124 L.Ed.2d 334 (1993), the Supreme Court addressed whether nonthreatening contraband detected through the sense of touch during a Terry patdown may be admitted into evidence. Analogizing to the “plain view” doctrine, which provides that if police are lawfully in a position to view an object and its incriminating character is immediately apparent they may seize it without a warrant, see, Horton v. California, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 2307-08, 110 L.Ed.2d 112 (1990), the Dickerson Court held if a police officer lawfully pats down a suspect’s outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect’s privacy beyond that already authorized by the officer’s search for weapons; its warrant-less seizure is justified by the same practical considerations that inhere in the plain-view context. Dickerson, 508 U.S. at 375-76, 113 S.Ct. at 2136-37.
Boyer, 2007-0476, p. 22, 967 So.2d at 472.
Here Officer Chapital testified that, when he frisked Simpson, he felt a “hardened object”. He also admitted that the bulge he saw, prior to the frisk, was 1 ^square-shaped and did not have the shape of a firearm. There was no testimony from Officer Chapital indicating that, once he removed the bag from Simpson’s waistband, he could tell by its shape and feel that it was either a weapon or contraband. Thus, the decision to remove and open the bag was unjustified.
We find that this assignment of error also has merit.

DECREE

For the forgoing reasons, this Court finds that the State failed to establish there was reasonable suspicion for the officers to stop Shawn Simpson, or that there was a reasonable belief that he was armed to support a frisk of Simpson, even if the State had shown reasonable suspicion to support the stop. Therefore, there was no lawful basis for the seizure of the bag of marijuana from Simpson’s waistband, and the district court erred by denying his motion to suppress the evidence. Accordingly, we reverse the denial of the motion to suppress the evidence, vacate the conviction and sentence of Shawn Simpson, and remand the matter for further proceedings.
CONVICTION AND SENTENCE VACATED; REMANDED
BELSOME, J., concurs in the result.